# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48294-1-II |
| Respondent, | Consolidated with No. 49554-6-II |
| v. | |
| CHRISTOPHER WILLIAM OLSEN, | UNPUBLISHED OPINION |
| Appellant. | |
| In re the Matter of the Personal Restraint of | |
| CHRISTOPHER WILLIAM OLSEN, | |
| Petitioner. | |

JOHANSON, J.P.T.[*] — This is a consolidated direct appeal and personal restraint petition (PRP). A jury convicted Christopher William Olsen of two counts of first degree murder and one count of second degree murder. In his appeal, Olsen argues that the trial court erred when it (1) gave an aggressor instruction, (2) denied his pretrial suppression motion, and (3) restricted voir dire. Olsen further argues that (4) the evidence was insufficient to convict him of a vacated first degree murder conviction and (5) the trial court abused its discretion when it allowed extrinsic

---

[*] Judge Jill M. Johanson is serving as a judge pro tempore for the Court of Appeals, pursuant to RCW 2.06.150.

evidence of a witness's prior inconsistent statement under ER 613(b). Olsen also (6) submits an extensive statement of additional grounds (SAG).[1] In his PRP, Olsen argues that (7) a witness's recantation constitutes newly discovered evidence that merits a new trial.

In Part One, regarding Olsen's direct appeal, we hold that the trial court properly (1) gave the aggressor instruction, (2) denied Olsen's pretrial suppression motion, and (3) allotted voir dire time. Further, we (4) decline to reach Olsen's argument that the evidence was insufficient to convict him of the vacated count, (5) hold that the trial court properly allowed extrinsic evidence under ER 613(b), and (6) reject Olsen's SAG arguments as lacking merit, relying on matters outside the record, or are too vague to address. We affirm Olsen's conviction. In Part Two, after a reference hearing regarding the witness's recantation, we deny Olsen's PRP.

FACTS

I. OVERVIEW

At approximately 6:00 PM on February 16, 2014, Robert Ward was shot and killed on Canyon Road in Pierce County. Olsen was arrested and eventually charged with first degree premeditated murder, first degree murder under circumstances manifesting an extreme indifference to human life, and second degree felony murder.

At Olsen's trial, the State introduced evidence that Ward had stolen Olsen's rental truck on the day before the shooting. Olsen learned from Presley Lind that her acquaintances, Nathan Stevenson and Joseph Kaplin, knew Ward. According to Lind, at Olsen's behest, she, Stevenson,

---

[1] RAP 10.10.

and Kaplin orchestrated a setup, so that Ward would be waiting at a shopping center on Canyon Road on February 16.

Olsen claimed that he went to the Canyon Road shopping center to recover his stolen belongings from Ward. Olsen brought a firearm with him, pulled up behind Ward's car, and chased after Ward when he fled. When Ward panicked and drove into oncoming traffic, Olsen stopped his truck on the median, turned back toward Ward, aimed, and shot Ward in the head, killing him.

## II. SUPPRESSION MOTION AND MOTIONS IN LIMINE

Before trial, Olsen filed a suppression motion, which included arguments about the validity of three "trap and trace" court orders obtained by police and authorizing the use of "pen register" or "trap and trace" devices to target Stevenson's, Lind's, or Olsen's phone number.[2] Clerk's Papers (CP) at 117. Olsen claimed that the trap and trace order that police obtained for Stevenson's phone did not authorize police to use a cell-site simulator ("Stingray") device, that Olsen had standing to contest the Stingray's use, and that "all evidence obtained as a result" should be suppressed. CP at 125, 121, 130. Olsen argued that police illegally located and arrested Stevenson on February 18 using the Stingray device. At the suppression motion hearing, Olsen also argued that because the trap and trace orders were all without respect to geographical limitations, they were all invalid.

In support of Olsen's suppression motion, he relied upon police interviews, affidavits, and the three trap and trace court orders to document the investigation into Ward's death. According

---

[2] Former RCW 9.73.260(2) (1998) forbade police from using a "pen register" or "trap and trace device" in nonemergency circumstances without first obtaining a court order.

3

to police affidavits, investigators learned that shortly before Ward's death, he had been in contact with Stevenson. Investigators obtained a search warrant for Stevenson's cell phone records. On February 17, police also obtained a trap and trace court order targeting Stevenson's phone number.

On February 18, police located and arrested Stevenson. Stevenson informed police of the involvement of Lind and a man named "Chris." CP at 230. Police located Olsen and subsequently arrested him in Idaho using information provided by his cell phone company under the trap and trace order that targeted his number.

In support of his suppression motion, Olsen also relied upon transcripts of defense interviews with Tacoma and Pierce County detectives. Detectives explained that they had the ability to actively plot the location of a cell phone using a Stingray device. The Stingray narrowed down a cell phone's location from data provided from the phone company; it apparently resembled a "mobile cell phone tower."[3] CP at 203. While investigating Ward's death, detectives deployed the Stingray to locate Stevenson but not to locate anyone else in the case.

The trial court denied Olsen's suppression motion because he lacked standing to contest the Stingray's use to apprehend Stevenson. As for Olsen's argument that the trap and trace orders were all facially invalid, the trial court focused on only the trap and trace order used to apprehend Olsen. The trial court ruled that Olsen did not have a privacy interest in his location.

---

[3] The information about the Stingray in the interviews is limited in the record. Under the terms of a nondisclosure agreement between police and the Federal Bureau of Investigation, detectives claimed they could not divulge many details.

### III. Jury Selection and Mistrial Motion

After swearing in prospective jurors, the parties and the trial court conducted voir dire. The trial court allowed 40 minutes of questioning per party "to begin with." Verbatim Report of Proceedings (VRP) (Sept. 14, 2015) at 351. The trial court cautioned the parties that it would "see where we are after that," and Olsen agreed that this was acceptable to him. VRP (Sept. 14, 2015) at 351.

Olsen questioned the venire about their perceptions of the criminal justice system, focusing on the burden of proof and the right to a jury trial and jury unanimity. After Olsen's time expired, he requested an additional 40 minutes, and the State requested an additional 5 minutes. The trial court granted each side an additional 15 minutes. Olsen then asked the venire about whether a killing could be justified in self-defense and their perceptions about firearms.

When the venire was excused, Olsen moved for a mistrial on the basis that the trial court improperly restricted voir dire. Olsen argued that the trial court never apprised him that his questioning during voir dire would be limited and that without further questioning, he was unable to broach the topic of police witnesses' credibility. The trial court denied the mistrial motion because both sides had adequate time to explore the issues.

### IV. Trial Testimony

At the beginning of trial and over Olsen's relevancy objection, the trial court allowed the State to use one "in-life" photograph of Ward with his family.

A. STATE TESTIMONY

1.    EVENTS LEADING UP TO THE SHOOTING

Olsen's acquaintances, Douglas Nelson and Lind, and Lind's acquaintances, Kaplin and Stevenson, testified for the State about the events leading up to the shooting. On February 15, the day before Olsen killed Ward, the two met for the first time at Nelson's home. According to Nelson, Olsen and Ward left Nelson's home together. Nelson had previously given Olsen a handgun.

Later that day, Olsen returned to Nelson's home, and Olsen reported that Ward had stolen Olsen's rental truck. Olsen was angry and remained upset despite Nelson's attempts to calm him down. Nelson warned Olsen to be careful because Ward had previously shot and killed someone, had robbed several of Nelson's friends, and carried a loaded handgun.

The next day, Olsen learned from Lind, a woman with whom Olsen used drugs and had a "casual relationship," that her acquaintances, Kaplin and Stevenson, knew Ward. Olsen wanted Lind, Kaplin, and Stevenson to "get [Ward] to meet [them] somewhere," and the four orchestrated a scheme to trick Ward into waiting at a shopping center on Canyon Road, ostensibly to sell drugs to Stevenson's cousin.[4] VRP (Sept. 16, 2015) at 719. Stevenson subsequently met with Ward, who showed his handgun to Stevenson. After this meeting, Stevenson told Lind to warn Olsen that Ward was armed.

---

[4] The State provided an exhibit summarizing the cell phone records of Lind, Kaplin, Stevenson, and Olsen on February 15 and 16 to corroborate this testimony.

Lind went to the Canyon Road shopping center to meet Olsen, who was driving a second rental truck. At the shopping center, Lind pointed out Ward's car to Olsen. Lind then approached Ward's car alone and spoke with Ward.

While Lind spoke to Ward, Olsen drove his truck behind Ward's car. Lind saw two passengers in Ward's car and told Ward that "his friends might want to get out of the car." VRP (Sept. 16, 2015) at 742. Instead, Ward "peeled out" of the parking lot with Olsen pursuing directly behind him. VRP (Sept. 16, 2015) at 743.

2. THE SHOOTING

a. PASSENGERS' TESTIMONY

Both Ward's passengers, Richard Pederson and Bryant Ward, testified for the State. Pederson, who was sitting in the front passenger seat of Ward's car, testified that he told Ward to leave when Lind warned Ward's passengers. When Ward left, Olsen began firing at Ward's car, and Ward quickly drove from the parking lot to an access road and onto Canyon Road.

At the intersection, Pederson told Ward to turn left onto Canyon Road, but Ward "panicked and took a right and went into oncoming traffic." VRP (Sept. 21, 2015) at 1158. Pederson then realized that Ward had been shot in the head. According to Pederson, Ward was armed with a small handgun, which Ward drew at the intersection of the access road and Canyon Road but never raised above his lap.

Bryant,[5] who had been sitting in the backseat of Ward's car, explained that he had received immunity for "any drug activity" on February 16 in return for his testimony. VRP (Sept. 21, 2015)

---

[5] Because the victim and Bryant Ward have the same last name, we refer to Bryant Ward by his first name. No disrespect is intended.

7

at 1101. According to Bryant, he heard a dozen gunshots coming from the pickup truck behind Ward's car, beginning within 5 to 10 seconds from when Ward accelerated his vehicle. Ward fled from the shopping center parking lot into an alley and out onto Canyon Road, turning into oncoming traffic. At this point, Olsen's truck was still pursuing. The gunshots continued, although Bryant neither heard anyone in Ward's car return fire nor saw a firearm in Ward's car. When some of the shots hit Ward's car, the car began to slow, and Bryant jumped out of the car and ran away from the scene.

       b.     BYSTANDERS' TESTIMONY

Bystanders who were driving on Canyon Road at the time of the shooting testified for the State. William Gamm, driving southbound, saw Ward's car driving north, into oncoming traffic in the left southbound lane. Gamm witnessed Olsen stop his truck partially on the median between northbound and southbound traffic. Then Olsen pointed a handgun out the truck's window, took aim, and shot four times at Ward's car. Ward's car was behind Olsen's truck and parallel to Gamm's vehicle, and Gamm feared he would be struck by the bullets. He recalled seeing Olsen's expression: "[j]ust a cold, intentional, wanting to hurt something [sic]." VRP (Sept. 22, 2015) at 1233. Another southbound driver testified that traffic was "medium" at the time and that any car on Canyon Road was in danger. VRP (Sept. 22, 2015) at 1268.

Verne Yates, who was traveling north on Canyon Road, testified that he saw Ward's car go through the intersection of Canyon Road. Ward's car turned into the wrong lane of traffic with a truck following immediately behind. A few seconds later, the truck jumped the median and traveled north. Another driver, who was at an intersection to the north of the shooting, heard three gunshots and then witnessed a truck drive past, running the red light.

3.    EVENTS AFTER THE SHOOTING

Police responded to the scene, where they found Ward's car with one bullet hole through the passenger window. Ward had been shot in the head and was unconscious; he was pronounced clinically brain dead the following day. A firefighter found Ward's handgun underneath Ward, on the driver's seat. The handgun was fully loaded but had no bullet in the chamber. A photograph of Ward's blood-covered cell phone, showing Stevenson's number as the last call, was also admitted over Olsen's objection.

Police subsequently recovered the rental truck that Olsen drove during the shooting. The truck's ignition lock had been destroyed, and its license plate was missing. Damage to the passenger mirror was consistent with shots fired from the driver's seat.

Nelson testified that he spoke to Olsen after the incident, and Olsen said that he was "getting out of Dodge." VRP (Sept. 16, 2015) at 691. Lind said that Olsen told her to tell authorities that she had seen Ward with a firearm "so that [Olsen] could claim self-defense." VRP (Sept. 16, 2015) at 750.

Olsen was arrested in Idaho. Over Olsen's objection, Detective Ryan Salmon testified that a black Samsung cell phone in a red case belonging to "Mistie Boutelier"[6] was discovered when police arrested Olsen. VRP (Sept. 17, 2015) at 974. Boutelier's cell phone was in Olsen's possession when he was arrested, although the State did not provide evidence about where the cell phone was located in relation to Olsen. This phone's internet search history showed various searches for news related to the shooting on Canyon Road and a visit to the "Washington Most

---

[6] Neither party called Boutelier as a witness.

Wanted website." VRP (Sept. 17, 2015) at 997. The phone had been used to send text messages containing hyperlinks to news articles about the shooting and asking whether "they had tried to contact her" or "if there were crows outside."[7] VRP (Sept. 17, 2015) at 998.

4.    NICOLE CLARK'S AND DETECTIVE DELGADO'S TESTIMONY

Olsen's live-in girlfriend, Nicole Clark, testified that she believed Olsen was home around 6:00 PM, the time of the shooting, on February 16. Clark stated that she had slept for a period of time that afternoon but awoke by 6:00 PM to prepare dinner. The prosecutor asked Clark about her prior statements to police that she "did not see Mr. Olsen from the time [she] went up to [her] bedroom for one to two hours after arriving home with the [rental truck] until the time [she] came downstairs at approximately 3:00 a.m." VRP (Sept. 17, 2015) at 916. In response, Clark stated, "Maybe my memory was a lot better then." VRP (Sept. 17, 2015) at 916. Earlier, the State had introduced evidence that Clark rented the second truck for Olsen at 2:07 PM on February 16.

Later, Detective John Delgado testified that he had interviewed Clark. Over Olsen's objection and pursuant to ER 613(b),[8] the trial court allowed Detective Delgado's testimony as extrinsic evidence of Clark's prior inconsistent statement about whether Olsen was home at 6:00 PM on February 16. Detective Delgado testified that during his interview of Clark, she stated that on February 16, she had slept from approximately an hour or two after returning home with Olsen until 3:00 AM.

---

[7] During Detective Salmon's testimony, the trial court also admitted three recordings from Olsen's cell phone over Olsen's objection that the videos were irrelevant and cumulative.

[8] ER 613(b) allows extrinsic evidence of a prior inconsistent statement if the witness is given an opportunity to explain or deny the prior inconsistent statement and the opposite party is given an opportunity to interrogate the witness thereon.

10

B. DEFENSE TESTIMONY

1. OLSEN'S TESTIMONY

Olsen testified. From Nelson, Olsen knew that Ward had once killed someone, carried a gun, and was dangerous. On February 15, Ward had accompanied Olsen to a casino parking lot to assist him in transferring items to his rental truck. Instead, Ward stole the rental truck.

According to Olsen, Lind told Olsen that one of her friends planned to purchase drugs from Ward and suggested that Olsen could go to their meeting place to try to regain his vehicle. She directed Olsen to drive to the Canyon Road shopping center. There, Olsen planned on speaking with Ward to regain the rental truck. Olsen admitted to bringing his handgun for this encounter because he thought that he might need protection from Ward.

According to Olsen's version of events, he pulled up behind Ward in the shopping center parking lot, and Ward "took off" from the parking lot down an access road. VRP (Oct. 1, 2015) at 2082. To Olsen, Ward seemed to be trying to get away from whoever was behind him. Olsen followed directly behind. While Olsen and Ward were on the access road, Olsen saw Ward "bringing [his] gun up," so Olsen "fired two rounds out the passenger window" of his truck as a warning. VRP (Oct. 1, 2015) at 2085.

When Ward reached the access road's intersection with Canyon Road, Olsen claimed that he did not see Ward turn into oncoming traffic; rather, Olsen thought Ward would turn left and that they would "go [their] separate ways." VRP (Oct. 1, 2015) at 2138. Olsen turned right and tried to compose himself for a moment but then heard horns honking and realized that Ward's car was behind Olsen's and driving toward him on the wrong side of the road. He saw a gun in Ward's hand. Ward pointed his gun at Olsen and before Ward could start shooting, Olsen "fired back."

11

VRP (Oct. 1, 2015) at 2088. Olsen did not stop his vehicle and fired over his shoulder three to four times. He left the scene without seeing the result of the shots that he fired.

Olsen described himself as being in a state of panic and fear. He threw his firearm in a dumpster, changed his phone number, "dug . . . out" the second rental truck's ignition, and traveled to Idaho.[9] VRP (Oct. 1, 2015) at 2147. When Olsen spoke to Clark after the incident, he told her that he did what he had to do to keep his family safe.

2.      OTHER DEFENSE TESTIMONY

Olsen also relied on the testimony of a witness who was familiar with Ward and explained that Ward had a reputation for violence and a habit of carrying a firearm.

V. JURY INSTRUCTIONS

The trial court gave 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 16.02, at 248 (4th ed. 2016) (WPIC), the justifiable homicide instruction, instructing the jury that justifiable homicide was a defense to all charges. Justifiable homicide occurred if Olsen reasonably believed "the person slain intended to inflict death or great personal injury upon him," Olsen "reasonably believed that there was imminent danger of such harm being accomplished by the person slain," and Olsen employed the force and means that a reasonably prudent person would have employed under the circumstances as they reasonably appeared to Olsen. CP at 525. The trial court declined to include Olsen's proposed version of WPIC 16.02, which included that self-defense could be predicated on a belief that "the person slain *or others whom the defendant*

---

[9] Olsen initially sought to limit his testimony solely to events up to when shots were fired. The trial court, however, allowed the prosecutor to cross-examine Olsen about events after the shooting.

12

*reasonably believed were acting in concert with the person slain* intended to inflict death or great personal injury." CP at 553 (emphasis added).

Over Olsen's objection, the trial court also gave the aggressor instruction proposed by the State, WPIC 16.04, at 256, because in the trial court's view, there was evidence to support the instruction. The instruction stated,

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

CP at 530.

The trial court also gave WPIC 2.04.01, at 38, defining "great personal injury," and WPIC 2.04, at 36, defining "great bodily harm." CP at 520, 527. Fearing that the jury would be confused, and over Olsen's objection, the trial court added language to WPICs 2.04.01 and 2.04 to explain that they pertained to, respectively, "self-defense" and "assault in the first degree." CP at 520, 527. The trial court declined to give Olsen's proposed WPIC 17.02, at 268, defining lawful force.

## VI. CLOSING ARGUMENT

### A. PROSECUTOR'S CLOSING ARGUMENT

In closing argument, the prosecutor's theory of the case was that Olsen ambushed Ward by "lur[ing] and bait[ing]" Ward to the Canyon Road shopping center and then "hunt[ing] and kill[ing]" him. VRP (Oct. 2, 2015) at 2231. The prosecutor repeatedly emphasized this baiting and hunting theme and that Olsen chased Ward when he attempted to flee.

The prosecutor undermined testimony that Olsen's intention was merely to recover his stolen truck by relying on the testimony of Pederson and Bryant—Ward's passengers. Based on

13

Pederson's and Bryant's testimony, "we first learn that [Olsen] is not just trying to get his car back, he's intending to kill, because in that parking lot, he parks behind him, and as soon as they take off, he gives hot pursuit and he starts firing his gun." VRP (Oct. 2, 2015) at 2245. Corroborating that Olsen's intent was "to kill" was evidence that Olsen brought his handgun, that he never called 911 on February 16, and that Olsen was chasing Ward. VRP (Oct. 2, 2015) at 2245. The prosecutor also argued that Gamm's testimony was that Olsen's eyes were "cold," "evil," and "intentional" when he shot Ward. VRP (Oct. 2, 2015) at 2250.

### B. OLSEN'S CLOSING ARGUMENT

Olsen's closing focused on arguing self-defense—a defense to each of the charged crimes—and disputing that Olsen's intent was to kill Ward when Olsen arrived at the shopping center. Based on his own testimony, Olsen argued that he had seen a gun in Ward's hand when Ward sped down the access road and that Olsen had fired warning shots out his passenger window. When Olsen reached the intersection and turned right, he emphasized that his intent was "to leave" because he thought Ward would turn left and the encounter would end. VRP (Oct. 2, 2015) at 2279. On this point, Olsen disputed the credibility of Gamm's claim that Olsen had stopped his vehicle to turn back and shoot Ward.

Olsen also argued that he was following Ward to learn where Ward lived and where the stolen truck was located. He discussed the aggressor instruction and argued that Ward, not Olsen, was the aggressor because Ward had stolen from Olsen.

### C. REBUTTAL CLOSING ARGUMENT

In rebuttal closing argument, the prosecutor responded to Olsen's closing argument by pointing out that the theories that Olsen both followed Ward to locate Olsen's car and that Olsen

attempted to leave were mutually incompatible. Over Olsen's objection, the prosecutor also brought up Olsen's own testimony as evidence of "covering his tracks." VRP (Oct. 2, 2015) at 2299. And using the analogy of "whether or not a prostitute could be raped," the prosecutor reminded jurors that Ward's misdeeds did not make Olsen any less guilty. VRP (Oct. 2, 2015) at 2307.

VII. CONVICTION AND SENTENCING

The jury found Olsen guilty of all three counts—first degree premeditated murder, count I, first degree murder by extreme indifference, count II, and second degree felony murder, count III. Although Olsen requested that the trial court individually poll the jurors, the court polled the jury collectively, asking each juror to raise his or her hand. Each juror indicated that he or she concurred regarding each verdict.

Following Olsen's trial, the trial court vacated counts II and III, murder by extreme indifference and felony murder, to avoid double jeopardy violations. Olsen received a 608-month sentence on the remaining conviction, first degree premeditated murder, count I.

Olsen appeals his conviction.[10]

PART ONE – DIRECT APPEAL

ANALYSIS

I. AGGRESSOR INSTRUCTION

Olsen argues that the evidence did not support giving the aggressor instruction, WPIC 16.04, because he withdrew from the encounter. We disagree.

---

[10] Additional facts related to Olsen's PRP are provided *infra*, section I of Part Two.

The standard of review for a trial court's decision whether to give a jury instruction depends on the reason for the decision. "If the decision was based on a factual determination, it is reviewed for abuse of discretion." *State v. Condon*, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015). But "[i]f it was based on a legal conclusion, it is reviewed de novo." *Condon*, 182 Wn.2d at 316.

When we review whether the evidence supports giving a certain instruction, we look at the evidence in the light most favorable to the requesting party. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005) (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)). Our Supreme Court has approved WPIC 16.04 and stated that it is appropriate where the evidence conflicts regarding whether the defendant's conduct precipitated a fight. *Wingate*, 155 Wn.2d at 821-22 (quoting *State v. Riley*, 137 Wn.2d 904, 910, 976 P.2d 624 (1999)). An aggressor may revive his right to use self-defense only if he shows he "in good faith first withdr[ew] from the combat at a time and in a manner to let the other person know that he [was] withdrawing or intend[ed] to withdraw from further aggressive action." *Riley*, 137 Wn.2d at 909.

Here, the trial court decided that there was evidence to support giving the aggressor instruction.[11] Thus, we review the trial court's decision for an abuse of discretion. *See Condon*, 182 Wn.2d at 315-16.

---

[11] The instruction given stated,
No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.
CP at 530.

16

Viewed in the light most favorable to the requesting party, the State, the evidence supports a finding that Olsen precipitated the encounter. The State provided evidence that Olsen requested Lind's assistance to set Ward up, went to the Canyon Road shopping center where Ward was waiting, pulled up directly behind Ward's vehicle, and then, when Ward "peeled out," chased after Ward. VRP (Sept. 16, 2015) at 743. Ward's passengers also testified that Olsen was the first to shoot: Bryant heard a "[d]ozen" gunshots within 5 to 10 seconds of Ward accelerating, and Pederson testified that Olsen began "shooting at" Ward's car while Ward's car was still in the shopping center parking lot. VRP (Sept. 21, 2015) at 1111, 1158. Olsen's arguments on appeal that the parties disputed who first fired the shots and who first drew a weapon overlook that we take the evidence in the light most favorable to the State, and thus his arguments on this basis fail. *Wingate*, 155 Wn.2d at 823 n.1.

Olsen also argues that he provided evidence that he withdrew from the encounter, so that he revived his right to self-defense when he turned right at the intersection onto Canyon Road. *See Riley*, 137 Wn.2d at 909. In this regard, Olsen appears to rely on his own testimony that he thought Ward turned left and that they went their separate ways. However, Olsen overlooks that the State provided evidence to support that he did not withdraw from the fight. Bryant testified that Olsen continued shooting from when Ward's car was in the parking lot to when he turned onto Canyon Road. Pederson testified that Ward "would have gotten away," but he panicked and turned into oncoming traffic, where Olsen shot him. VRP (Sept. 21, 2015) at 1158. Taken in the light most favorable to the State, this evidence controverts that Olsen manifested an intent to withdraw and instead shows that Olsen continually pursued and shot at Ward until he killed him. *See Riley*, 137 Wn.2d at 909.

17

Viewed in the light most favorable to the State, the trial court did not abuse its discretion when it gave the first aggressor instruction.

## II. SUPPRESSION MOTION

Olsen argues that the trial court erred in denying his motion to suppress because the police's use of the Stingray device to apprehend Stevenson was illegal, and thus evidence of Olsen's flight to Idaho and evidence found on Boutelier's cell phone when Olsen was arrested should have been suppressed. We disagree.

We review de novo legal conclusions on a motion to suppress. *State v. Hinton*, 179 Wn.2d 862, 867, 319 P.3d 9 (2014). The proponent of a motion to suppress has the burden to show standing—that his own Fourth Amendment rights were violated by the challenged search. *State v. Goucher*, 124 Wn.2d 778, 787, 881 P.2d 210 (1994). "Fourth Amendment rights are 'personal rights' that may not be vicariously asserted"; one cannot invoke the Fourth Amendment rights of others. *State v. Jones*, 68 Wn. App. 843, 847, 845 P.2d 1358 (1993) (quoting *State v. Foulkes*, 63 Wn. App. 643, 647, 821 P.2d 77 (1991)). To show standing, the challenger must have a personal Fourth Amendment privacy interest in the area searched or the property seized. *State v. Simpson*, 95 Wn.2d 170, 174-75, 622 P.2d 1199 (1980); *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

Olsen acknowledges that he must show standing but claims that "the unique qualities of the Stingray give everyone a privacy interest in preventing its use." Am. Br. of Appellant at 31. We reject this argument.

Olsen relies on two factual assertions that the record does not support: first, he asserts that anywhere from "20" to "20 million" people's data could have been "monitor[ed] and store[d]"

18

when police used a Stingray device to locate and arrest Stevenson. Am. Br. of Appellant at 32. Notably, Olsen provides no citation to the record to substantiate his claims that the Stingray's use invaded the privacy rights of anyone other than Stevenson. Neither do the interview transcripts provided by Olsen in support of his suppression motion substantiate his claims: the detective used the Stingray to plot a phone's location from general location data provided by the phone company but provided no information about whether the Stingray captured others' content.

Second, Olsen asserts that "[t]here is a high likelihood Olsen's cell phone was tracked along with thousands of others on February 18." Am. Br. of Appellant at 32. Again, Olsen's argument that his privacy rights were violated is entirely speculative and relies on no factual support from the record. Because Olsen fails entirely to show that his privacy rights were violated and because the record is devoid of support for his statement that up to "20 million" people's privacy was invaded, he does not meet his burden to show standing. Am. Br. of Appellant at 32.

Olsen cites *State v. Young*, 123 Wn.2d 173, 867 P.2d 593 (1994). But *Young* did not hold that the neighbors had standing to contest the thermal investigations. 123 Wn.2d at 186-87. Further, in *Young*, there was evidence that police actually used the thermal detection device on other residences than the defendants. 123 Wn.2d at 178. In contrast, here, Olsen fails to point to any evidence, other than speculation, that the Stingray was used on anyone's device other than Stevenson's.

Olsen also cites to *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018).[12] *Carpenter* held that an individual has a privacy interest, for Fourth Amendment purposes, in the record of his past physical movements as captured through cell-site location information (CSLI). *Carpenter*, 138 S. Ct. at 2217. The Supreme Court held that the government must obtain a search warrant before acquiring the CSLI information. *Carpenter*, 138 S. Ct. at 2221. As discussed above, Olsen has not shown that his physical movements were captured by CSLI. And to the extent Olsen relies on Stevenson's CSLI, his argument also fails because *Carpenter* does not address the issue of standing based on the invasion of another person's privacy interest.

In supplemental authorities, Olsen cites *Jones v. United States*, 168 A.3d 703 (D.C. 2017), and *Maryland v. Andrews*, 227 Md. App. 350, 134 A.3d 324 (2016). But neither case addresses standing. Both cases involved the defendant's own CSLI. Thus, neither case supports Olsen's claim that he has standing to assert a violation of Stevenson's right to privacy in Stevenson's CSLI. Because Fourth Amendment rights are personal rights that may not be vicariously asserted, Olsen cannot invoke Stevenson's Fourth Amendment rights. *Jones*, 68 Wn. App. at 847. And to the extent his argument rests on a violation of his own privacy rights, the record fails to support that any CSLI about Olsen was obtained.

---

[12] Olsen cites to *Carpenter* in his post-reference hearing supplemental briefing. Although this issue is outside the scope of the reference hearing, we address it here as an extension of his direct appeal argument.

Accordingly, Olsen lacked standing to contest the Stingray's use to locate Stevenson because he fails to show that his privacy interest was invaded. We affirm the trial court's denial of Olsen's suppression motion on this basis.[13]

### III. VOIR DIRE

Olsen argues that the trial court abused its discretion because it unreasonably restricted his voir dire time. We hold that the trial court did not abuse its discretion.[14]

"It is well settled that trial courts have discretion in determining how best to conduct voir dire." *State v. Davis*, 141 Wn.2d 798, 825, 10 P.3d 977 (2000). This discretion includes ensuring that an impartial jury is selected with reasonable expedition. *State v. Frederiksen*, 40 Wn. App. 749, 753, 700 P.2d 369 (1985). "[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of voir dire will not be disturbed on appeal." *Davis*, 141 Wn.2d at 826.

At Olsen's trial, the trial court employed a wait-and-see approach, in which it first gave each party 40 minutes to conduct voir dire and then determined how much time to allot for a second round of voir dire. The trial court said that after the initial 40 minutes per side, "we'll see where we are." VRP (Sept. 14, 2015) at 351. In doing so, the trial court was within its considerable discretion to determine the amount of time for voir dire. *See Davis*, 141 Wn.2d at 825.

---

[13] The dissent would also affirm but for a different reason. Dissent at 88.

[14] In his SAG, Olsen also argues that it was ineffective assistance of counsel not to clarify how much time was remaining for voir dire. But it was reasonable for Olsen's trial counsel not to inquire further because the trial court decided to wait until the first portion of voir dire had been completed before deciding how much more time to allot. Accordingly, Olsen fails to show deficient performance, and thus, his related ineffective assistance of counsel claim fails.

After the first round of voir dire was complete, Olsen requested 40 additional minutes, and the State requested 5 minutes. The trial court granted an additional 15 minutes per side. Olsen argues that the trial court's "reduc[tion]" of the second session of voir dire from 40 to 15 minutes was unreasonable and an abuse of discretion. Am. Br. of Appellant at 36. But Olsen mischaracterizes the trial court's decision: the trial court did not promise an additional 40 minutes only to later "reduce" this time. Rather, the trial court promised the parties they would have 40 minutes each for voir dire but cautioned them that after this time elapsed, it would "see where we are." VRP (Sept. 14, 2015) at 351.

Olsen relies on *State v. Brady*, in which a trial court promised the parties a second round of voir dire but then, part way through questioning, decided there was not enough time for a second round of questioning and ended voir dire. 116 Wn. App. 143, 145-46, 64 P.3d 1258 (2003). We held that the trial court abused its discretion by changing the planned questioning during the middle of voir dire, entirely eliminating the promised second questioning period. *Brady*, 116 Wn. App. at 147-48. But in contrast to *Brady*, here, the trial court acted entirely consistently with what it told the attorneys: it never promised an additional 40 minutes for the second round of questioning. Neither did it entirely forego a promised second round of questioning. *Brady* is distinguishable, and we hold that the trial court did not abuse its discretion.

IV. SUFFICIENCY OF THE EVIDENCE: COUNT II, MURDER BY EXTREME INDIFFERENCE

Olsen and the State dispute whether sufficient evidence supports his conviction for murder by extreme indifference. Because we affirm Olsen's conviction for count I, first degree premeditated murder, we do not reach Olsen's argument that there was insufficient evidence to support his vacated conviction for count II, murder by extreme indifference.

22

## V. ER 613(b) IMPEACHMENT OF CLARK

Olsen argues that the trial court abused its discretion when it allowed extrinsic evidence—Detective Delgado's testimony—to impeach Clark's testimony about Olsen's whereabouts on the evening of February 16. We hold that the trial court did not abuse its discretion.

We review a trial court's decision to admit extrinsic evidence under ER 613(b) for an abuse of discretion. *See State v. Dixon*, 159 Wn.2d 65, 77, 147 P.3d 991 (2006). "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." ER 613(b). Under this rule, extrinsic evidence of the prior inconsistent statement is inadmissible if the witness admits making the prior inconsistent statement. *Dixon*, 159 Wn.2d at 76. "If the witness does not admit or deny making the statement but indicates doubt, lack of memory, or lack of knowledge, the answer of the witness will be treated as a denial." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 613.10, at 594-95 (6th ed. 2016).

When Clark testified, she stated that she had slept during the afternoon of February 16 but awoke by 6:00 PM—the approximate time of the shooting—to prepare dinner. She remembered Olsen being at home with her around 6:00 PM. In contrast, Clark had told Detective Delgado that she was asleep that day from one to two hours after she arrived home with Olsen until 3:00 AM. Earlier, the State had introduced evidence that Clark rented the second truck for Olsen at 2:07 PM on February 16.

The prosecutor questioned Clark about her statement to Detective Delgado, and the following exchange occurred:

23

[Prosecutor:]  . . . Do you recall telling [detectives] that following your rental of the U-Haul pickup truck you and Mr. Olsen hung out at your apartment for one to two hours?

[Clark:]  Possibly.

[Prosecutor:]  Do you remember telling the detectives that you went upstairs to rest in your bedroom?

[Clark:]  I might have said that.

[Prosecutor:]  Okay. Do you recall telling the detectives that you did not see Mr. Olsen from the time you went up to your bedroom for one to two hours after arriving home with the U-Haul until the time you came downstairs at approximately 3:00 a.m. on February 17th, 2014?

[Clark:]  Maybe my memory was a lot better then.

VRP (Sept. 17, 2015) at 916. Clark did not admit to making the prior inconsistent statement; rather, she equivocally stated that she "possibly" or "maybe" gave an inconsistent account. The purpose of inquiring about the prior inconsistent statement was unsatisfied because Clark did not impugn her credibility when she failed to admit making the prior inconsistent statement. The trial court was within its discretion to determine that Clark did not admit making the prior inconsistent statement and accordingly to permit impeachment by extrinsic evidence.

## VI. SAG ISSUES

### A. SUPPRESSION MOTION

1. TRAP AND TRACE ORDERS' TARGETS

Related to the three trap and trace orders obtained by police, Olsen argues that each order was facially invalid because it listed Stevenson as the target. We disagree.

Police obtained trap and trace orders successively for numbers associated with Stevenson, Lind, and Olsen. Contrary to Olsen's argument that each order lists Stevenson, the orders list, respectively, Stevenson, Lind, and Olsen as targets. And the affidavits in support of the orders targeting Lind and Olsen provide lengthy explanations of why Lind or Olsen were being targeted;

24

they do not refer to Stevenson alone. Olsen's arguments mischaracterize the record and we reject them.

2.      TRAP AND TRACE ORDERS WITHOUT GEOGRAPHIC LIMITATION

Related to the three trap and trace orders obtained by police, Olsen also argues that each order was facially invalid because it stated it was "'without respect to geographical limitations.'" SAG at 26. We address only the court order targeting Olsen's number and we hold that any error in this regard was harmless.

a.      LEGAL PRINCIPLES

If evidence is admitted that was the product of an improper warrantless search, we apply the constitutional harmless error standard to determine whether to reverse. *State v. Smith*, 165 Wn. App. 296, 316, 266 P.3d 250 (2011), *aff'd*, 177 Wn.2d 533, 303 P.3d 1047 (2013). "A constitutional error is harmless if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *Smith*, 165 Wn. App. at 316. But even under the constitutional harmless error test, error in admitting evidence that is cumulative or duplicative of other properly admitted trial evidence and adds little to the defendant's guilt may be harmless. *See Smith*, 165 Wn. App. at 316.

Former RCW 9.73.260(2) (1998) provides for trap and trace orders. At the time police obtained the trap and trace orders in this case, former RCW 9.73.260(3) (1998) allowed police to apply for "orders and extensions of orders authorizing the installation and use of pen registers and trap and trace devices as provided in this section." The trial court entered such an order if it found "that the information likely to be obtained" would be "relevant to an ongoing criminal investigation." Former RCW 9.73.260(4) (1998).

The trial court also had to find that there was probable cause that the device would "lead to obtaining evidence of a crime" or "learning the location of a" witness or suspect for whose arrest there was probable cause. Former RCW 9.73.260(4). The order had to specify information including "[t]he number and, if known, physical location of the telephone line to which the pen register or trap and trace device is to be attached and, in the case of a trap and trace device, the *geographic limits* of the trap and trace order." Former RCW 9.73.260(4)(c) (emphasis added).

b.   ANALYSIS

Here, all three trap and trace orders stated that they authorized the installation and use of a trap and trace device on the target number to trace and identify the location and subscribers for numbers used to place calls to the target number "without respect to geographic limitations." CP at 221, 236, 253. Before trial, Olsen brought a suppression motion related to all three trap and trace orders, including the trap and trace order used to locate him. Olsen first claimed at the suppression hearing that the orders were invalid for failure to specify the geographic limitations of the trap and trace order. The trial court denied Olsen's suppression motion. It rejected his geographic limitations argument on the basis that Olsen did not have a privacy interest in his location when he was arrested.

We resolve this issue by assuming without deciding that the trap and trace order targeting Olsen was facially invalid and accordingly that evidence obtained using this trap and trace order was obtained in violation of Olsen's constitutional rights.[15] Here, Boutelier's phone's internet

---

[15] At the outset, as set forth above, Olsen lacked standing to contest the trap and trace order used to locate Stevenson, and he provides no argument or claim that he had standing to contest the trap and trace orders used to locate either Stevenson or Lind in his SAG. Accordingly, we consider Olsen's argument related to only the trap and trace order that targeted Olsen.

search history showed various searches for news related to the shooting on Canyon Road and a visit to the "Washington Most Wanted website." VRP (Sept. 17, 2015) at 997. The phone had been used to send text messages containing hyperlinks to news articles about the shooting and asking whether "they had tried to contact her" or "if there were crows outside." VRP (Sept. 17, 2015) at 998. All this evidence as well as Olsen's arrest in Idaho were used at trial to show Olsen's consciousness of guilt.

However, this evidence added little to the determination of Olsen's guilt and went to the same issues as other, untainted trial evidence. *See Smith*, 165 Wn. App. at 316. Olsen himself testified that he fled to Idaho and explained that he did so because he panicked following the shooting. The evidence was also duplicative of multiple other sources of evidence that Olsen covered up his involvement, fled the state after shooting Ward, and sought to avoid apprehension for the shooting. Investigators found the rental truck that Olsen drove during the shooting with its ignition lock destroyed and its license plate missing.

Olsen himself testified that he threw away his firearm, changed his phone number, and wrecked the ignition lock. Nelson recounted that Olsen said he was "getting out of Dodge" after the incident. VRP (Sept. 16, 2015) at 691. And Lind said that Olsen told her to tell authorities that she had seen Ward with a firearm so that Olsen could claim self-defense.

Further, the other evidence of Olsen's guilt at trial was overwhelming. Olsen's self-defense claim rested on his assertion that he shot over his shoulder at Ward as Olsen attempted to flee from Ward, who was pursuing. But Gamm, another driver on the road, testified that he saw Olsen stop his truck on the median and deliberately aim back at Ward's car, shooting Ward. Not only this, but no other witness at Olsen's trial corroborated his claim that Ward pointed a firearm at Olsen

27

first; rather, both of Ward's passengers testified that Olsen immediately began shooting when Ward fled.

We hold that any error in this regard was harmless under the constitutional harmless error test.

3.    UNRELATED FEDERAL STATUTE

In a single sentence, Olsen also argues that the pen register orders fail to meet the necessity requirement of 18 U.S.C. § 2518.  But Olsen fails to argue or provide authority that 18 U.S.C. § 2518, a statute governing the federal procedure for interception of electronic communications, applies here.  Accordingly, we reject Olsen's argument.[16]

B.  SUFFICIENCY OF THE EVIDENCE (COUNT I)

Olsen asserts in a single sentence that the evidence was generally insufficient to convict him of count I, first degree premeditated murder.  This argument fails.

As charged here, Olsen was guilty of first degree murder if "[w]ith a premeditated intent to cause the death of another person, he . . . cause[d] the death of such person or of a third person." RCW 9A.32.030(1)(a).  Premeditation is the "'deliberate formation of and reflection upon the intent to take a human life'" and may be proven by circumstantial evidence.  *State v. Gentry*, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995) (quoting *State v. Robtoy*, 98 Wn.2d 30, 43, 653 P.2d 284 (1982)).

Viewed in the light most favorable to the State, the evidence showed the following:  after Olsen learned from Lind that Stevenson knew Ward, Olsen told Lind that Ward had stolen from

---

[16] The remainder of Olsen's SAG issues related to the suppression motion are too vague to address.

Olsen and he wanted to know if Lind, Stevenson, and Kaplin could "get [Ward] to meet [them] somewhere." VRP (Sept. 16, 2015) at 719. Olsen brought a firearm with him, pulled up behind Ward's car, and chased after Ward when he fled. When Ward panicked and drove into oncoming traffic, Olsen stopped his truck on the median, turned back toward Ward, aimed, and shot Ward in the head, killing him. It is a reasonable inference from this evidence that Olsen deliberately formed the intent to take Ward's life. Accordingly, sufficient evidence supports Olsen's conviction for premeditated murder, count I.

## C. ALLEGED EVIDENTIARY ERRORS

### 1. LEGAL PRINCIPLES

We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). Generally "[a] party may assign evidentiary error on appeal only on a specific ground made at trial." *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). Otherwise, we do not address issues first raised on appeal. *Kirkman*, 159 Wn.2d at 926. And even if the trial court erred, we reverse for evidentiary error only if there is a reasonable probability that the error materially affected the outcome of the trial. *State v. Stenson*, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997).

Under ER 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

### 2. IN-LIFE PHOTOGRAPH

Olsen argues that the trial court abused its discretion when it admitted one in-life photograph of Ward because the State failed to authenticate the photograph and the photograph

29

was overly prejudicial. We hold that Olsen waived his failure-to-authenticate argument and that any error under ER 403 was harmless.

First, Olsen claims that the State failed to properly authenticate the photograph, which showed Ward when he was about 21 years old with his family. But at trial, Olsen did not object on the basis of the State's failure to authenticate, and accordingly this argument is waived on appeal. *See Kirkman*, 159 Wn.2d at 926.

Second, Olsen claims that the trial court erred because the photograph, which showed Ward with his family, was overly prejudicial. An in-life photograph of the victim is not inherently prejudicial, particularly where, as here, the jury was shown autopsy photographs of the victim. *State v. Furman*, 122 Wn.2d 440, 452, 858 P.2d 1092 (1993). In-life photographs are relevant to show identification. *Finch*, 137 Wn.2d at 811.

Here, the photograph of the victim was relevant to show identification. *See Finch*, 137 Wn.2d at 811. The presence of the victim's family was unnecessary. However, in light of the fact that there was only one in-life photograph, that the jury was also shown autopsy photographs of the victim, and that this photograph was only one of many exhibits, including photographs shown to the jury, we hold that the trial court did not abuse its discretion when it allowed the photograph. *See Finch*, 137 Wn.2d at 811.

3.      PHOTOGRAPH OF WARD'S CELL PHONE

Olsen argues that the trial court abused its discretion when it allowed a photograph of Ward's cell phone that showed Stevenson's number as the last call received. We disagree.

Over Olsen's ER 403 objection, the State introduced a photograph of Ward's cell phone to verify the condition of the cell phone when it was recovered and to corroborate police testimony

about Stevenson's call history on February 16. The photograph of Ward's cell phone showed that the most recent call was from Stevenson's number and also showed previous communication between Stevenson and Ward. The photograph further showed red markings that appeared to be blood.

Detective Salmon, who took the photograph, testified that he did so to document the cell phone's condition when he received it. Detective Salmon had never obtained Ward's cell phone records. Rather, it was his manual examination of Ward's cell phone, showing that Stevenson had called Ward around the time of the shooting that led Detective Salmon to suspect Stevenson's involvement. The State also introduced evidence from Stevenson's phone records that showed communications between Stevenson and Ward on February 16, thus corroborating Stevenson's testimony that he had been in communication with Ward that day.

The photograph of Ward's cell phone was minimally prejudicial because it had red markings that appeared to be blood. However, the trial court was within its discretion to conclude that the probative value of the photograph of the cell phone—which corroborated testimony about the course of the investigation and Stevenson's involvement in setting up Ward—was not substantially outweighed by the danger of unfair prejudice. *See* ER 403. Accordingly, the trial court did not abuse its discretion.

4. BOUTELIER'S CELL PHONE

Olsen argues that evidence taken from Boutelier's cell phone, which was found when Olsen was arrested, should not have been admitted because there was no showing that Olsen possessed the cell phone. He argues both that the State never proved that he used the phone and that his right to confront Boutelier, whom he claims was the witness against him, was violated. We disagree.

31

Under ER 104(b), when "the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." The confrontation clause bars the admission of testimonial statements of a witness who does not appear at trial unless the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Over Olsen's objection on relevance grounds, the State introduced the contents of Boutelier's cell phone, including internet searches for news articles discussing the shooting. The trial court admitted the evidence under ER 104(b) on the condition that the State's witness would explain that the cell phone was found when Olsen was arrested but was not on Olsen's person. And a detective subsequently explained this to the jury. Thus, the jury heard evidence that the cell phone was in Olsen's possession when he was arrested but no evidence about whether it was on his person.

The trial court was within its discretion to admit evidence taken from Boutelier's cell phone because the State introduced evidence sufficient to support a finding of the needed fact—that Olsen had access to Boutelier's cell phone because he possessed it when he was arrested. Further, because the evidence was admitted on the condition that the State would show that *Olsen* conducted the searches, whether Boutelier conducted the searches went to the evidence's weight. If the jury believed that Boutelier conducted the searches, the cell phone evidence would simply be irrelevant to Olsen's guilt. Accordingly, Olsen fails to show that the trial court abused its discretion.

As for Olsen's confrontation clause argument, the State introduced the cell phone on the theory that Olsen conducted the internet searches. Olsen's confrontation clause rights were not violated because under the State's theory, the witness against him was himself.[17] *See Crawford*, 541 U.S. at 53-54. Accordingly, Olsen's confrontation clause argument fails.

5.      RECORDINGS FROM OLSEN'S CELL PHONE

Olsen argues that the trial court abused its discretion when it allowed recordings from his cell phone to be used as evidence without first requiring authentication of the recordings. We hold that this issue was waived.

When the State introduced the recordings from Olsen's cell phone, Olsen objected on the basis that the recordings were irrelevant and cumulative. He did not argue that the recordings were not authenticated. Accordingly, Olsen waived his argument that the recordings were not properly authenticated. *See Kirkman*, 159 Wn.2d at 926.

6.      CALL AND TEXT MESSAGE RECORDS SUMMARY

Olsen argues that it was an abuse of discretion for the trial court to admit a summary of witnesses' February 15 and 16 call and text message records. He asserts that by putting names with numbers, the State created new trial evidence. We reject this argument.

At trial, Olsen objected to this exhibit on the same grounds. In response and after the trial court expressed concern about pairing witnesses' names with telephone numbers, the State

---

[17] For this reason, *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002), is distinguishable—that case involved limitations on the defendant's ability to cross-examine his brother, a witness against him.

33

redacted the names from the summary. Thus, Olsen's argument fails because the names were redacted from the State's summary.

7.    IN CAMERA REVIEW OF STINGRAY INFORMATION

Olsen argues that the trial court erred because it allegedly granted a motion for in camera review "of documents and information related to the . . . 'Stingray'" but failed to actually conduct an in camera review. Suppl. SAG at 1. We disagree.

Olsen cites to a portion of the record in which the trial court granted Olsen's discovery request related to documents showing that the prosecutor's office was aware that police were using "wireless collection equipment/technology to conduct electronic surveillance in the State of Washington." VRP (Aug. 19, 2015) at 19. The prosecutor said that if any documents contained information about ongoing investigations, "the State will provide that, but we *may very well be asking the Court to review that in camera prior to disclosure.*" VRP (Aug. 19, 2015) at 23. But the prosecutor did not ask the trial court to conduct in camera review, and Olsen mischaracterizes the record when he states that the trial court actually granted a motion for in camera review. Accordingly, we reject Olsen's argument.

D.  PROSECUTORIAL MISCONDUCT

Olsen alleges a number of instances of prosecutorial misconduct. We hold that most of the prosecutor's comments were proper except for the prosecutor's argument about attempted assault and comments that Olsen's expression was "evil." However, the attempted assault argument was not prejudicial. And the "evil" comments were not so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice.

To show prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the record and all the circumstances of trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Where the defendant objected, he must show that the prosecutor's misconduct was substantially likely to affect the verdict. *State v. Allen*, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). Where the defendant did not object, he must show that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the resulting prejudice. *Glasmann*, 175 Wn.2d at 704.

Although a prosecutor may not express an independent, personal opinion that the defendant is guilty, the prosecutor may argue that the testimony supports the defendant's guilt. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). "'[I]f the evidence indicates that the defendant is a murderer or killer, it is not prejudicial to so designate him.'" *McKenzie*, 157 Wn.2d at 57 (quoting *State v. Buttry*, 199 Wash. 228, 250, 90 P.2d 1026 (1939)). The prosecutor is also entitled to make a fair response to defense counsel's arguments. *State v. Brown*, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). However, closing argument that relies upon facts not in evidence is improper. *State v. Warren*, 165 Wn.2d 17, 29, 195 P.3d 940 (2008).

1.     ALLEGED INDEPENDENT EXPRESSIONS OF OLSEN'S GUILT

Olsen points to a number of portions of the prosecutor's closing argument that Olsen argues constituted an impermissible independent opinion as to Olsen's guilt. Olsen fails to show that the prosecutor's arguments were improper, as set forth below.

a.     PROSECUTION'S THEORY OF THE CASE

Olsen objects to several comments that constituted the prosecutor's argument that Olsen orchestrated a setup of Ward and then pursued the fleeing Ward to shoot him:

35

> Ladies and gentlemen, the case you've heard about, the case about an ambush on February 16th, 2014, where Christopher Olsen lured and baited Robert Ward to the location at 176th and Canyon, and he put a bullet in his head, a bullet that went through both sides of his brain, bounced off his skull on the other side and killed him.
>
> There's essentially two questions for you in this case. Question number one is on February 16th, 2014, did Christopher Olsen hunt and kill Robert Ward? The answer to that question is absolutely.

VRP (Oct. 2, 2015) at 2231; VRP (Oct. 2, 2015) at 2293 ("[I]t's a case about an ambush."). These arguments were based on the State's evidence that Olsen went to the Canyon Road shopping center with the intent to murder Ward. Thus, the State's arguments are not an improper, independent opinion of Olsen's guilt. *See McKenzie*, 157 Wn.2d at 53, 57.

Olsen also argues that it was improper for the prosecutor to undermine Olsen's claim that it was unlikely he could purposely shoot Ward in the head:

> [After summarizing the defense's theory that it was unlikely that Olsen was able to aim his gun so well that he shot Ward in the temple,] it's a heck of a lot more astronomical that it happened that someone was just trying to, oh, I'm going to -- I'm going to fire some shots because I see a glimmer of a hint of a gun.

VRP (Oct. 2, 2015) at 2296. The prosecutor was entitled to argue that the evidence better supported the prosecutor's theory of the case than Olsen's theory of the case, which included that Olsen had been firing over his shoulder when his bullet struck Ward.

Olsen alleges that it was improper for the prosecutor to rely on inferences from Olsen's actions after the shooting:

> What does he do after he ditches the gun? . . . [H]e takes off. Gets out of town. He goes to eastern Washington. His testimony was to go visit his mom. Something to do after you've killed somebody.
> . . . .
> . . . He's covering his tracks because he murdered someone. Well, is that it? Well, does he do anything in Idaho? Yeah, he does. He Googles himself, his name, in connection with a shooting at 176th and Canyon. Detective Salmon

> testified to that. He's also . . . asking if the crows are coming for him, if anyone's looking for him.

VRP (Oct. 2, 2015) at 2299. At trial, there was evidence of Olsen's consciousness of guilt, including his flight from the state, destruction of the truck's ignition lock and license plate, and throwing away his handgun and changing his phone number. The prosecutor properly argued that the inferences from this evidence supported that Olsen murdered Ward. *See McKenzie*, 157 Wn.2d at 53.

> Finally, Olsen argues that the prosecutor could not argue that Olsen "murder[ed]" Ward:

> Christopher Olsen committed murder. He committed it in a nefarious -- well, he committed it in one way, and it fits with three charges against him, including the lesser included.
> . . . The first aggressor instruction tells you you don't even get -- Christopher Olsen doesn't even have that defense available to him of self-defense.

VRP (Oct. 2, 2015) at 2309. This argument included both the prosecutor's theory of the case that Olsen murdered Ward and that Olsen could not claim self-defense because he was the first aggressor. It was not improper.

>> b.    ALLEGED APPEAL TO PASSION

> Olsen appears to argue that it was improper for the prosecutor to argue,

> During voir dire, my colleague, [the other prosecutor], asked about whether or not a prostitute could be raped. . . . And one of the jurors, potential jurors talked about how the issue would be consent.
> Robert Ward never consented to having a bullet in his head. By using drugs, Robert Ward did not concede to being hunted down and having a bullet put through his brain. And that's exactly what Christopher Olsen did to him.

VRP (Oct. 2, 2015) at 2307-08. Here, there was evidence that the victim was a drug dealer and perhaps even a murderer. The prosecutor could remind the jury that the fact that the victim was

unsympathetic did not bear on his killer's guilt. In doing so, the prosecutor did not improperly appeal to passion or prejudice. Accordingly, we hold that this argument was not improper.

     c.     RESPONSE TO OLSEN'S CLOSING ARGUMENT

Olsen also argues that the prosecutor erred by responding to some of Olsen's closing arguments. From rebuttal closing argument, Olsen points to the following allegedly improper argument:

> Now, the defense has some interesting theories here. They kind of have two. They contradict one another. I want you to think about that.
> . . . .
> . . . Because what the defense just argued in their closing argument is, well, Mr. Pederson is telling [Ward] to go left, and he goes through the -- through the intersection, so Christopher Olsen is going to take a right because now I'm just done. . . . I'm going to go on my way.
> But then at the same time they want to argue that now he's trying to follow him so that he can now call police and see where he goes. You can't follow somebody and leave that person at the same time. Those arguments fly in each other's face, and the defense is proposing both of them. It's absurd.

VRP (Oct. 2, 2015) at 2293-94. The prosecutor was allowed to point out logical inconsistencies in response to Olsen's closing argument. *See Brown*, 132 Wn.2d at 566. This argument was a proper response to Olsen's claim in his own closing that Olsen was both attempting to flee from Ward and following Ward to learn where Ward lived.

Olsen also relies upon the prosecutor's response to Olsen's theory that he was retreating:

> The defense counsel brought up the jury instruction that refers to the fact that you don't have a duty to retreat, and that's true. . . . But Mr. Olsen didn't retreat. As soon as he killed somebody he got out of there and he got out of there as fast as he could. . . . Why do you retreat if it's self defense?

VRP (Oct. 2, 2015) at 2297-98. This argument was a response to Olsen's argument that he had a right to be driving on the same streets as Ward and that the law imposed no duty of retreat. Again,

it was a proper response to Olsen's closing argument and hence is not prosecutorial misconduct. *See Brown*, 132 Wn.2d at 566.

2.     ALLEGED MISCHARACTERIZATIONS OF THE EVIDENCE

Olsen also claims that the prosecutor argued facts not in evidence on a number of occasions during closing argument.

First, Olsen claims that the prosecutor supplemented the evidence when he stated that "Christopher Olsen in that . . . truck pulls up right behind Robert Ward.  Now, Robert Ward's reaction goes from confused to terrified."  VRP (Oct. 2, 2015) at 2239.  But this closing argument was proper because at trial, Pederson testified that Ward was unfamiliar with Lind, who approached Ward's car, and that Ward fled when Olsen began shooting at Ward's car but then "panicked" and drove into oncoming traffic.  VRP (Sept. 21, 2015) at 1158.  Pederson's description of events supports the prosecutor's characterization of Ward's reaction as confused, then terrified.

Second, Olsen claims that it was improper for the prosecutor to characterize Olsen as "livid" when he went to Nelson's home and "rant[ed] about getting [car]jacked."  VRP (Oct. 2, 2015) at 2233.  But again, this argument was properly based upon trial evidence—Nelson's testimony that Olsen was "pissed off" and described the details of how Ward had stolen his truck on February 15.  VRP (Sept. 16, 2015) at 686-87.

Third, Olsen points to two occasions on which the prosecutor argued that Gamm, one of the other drivers on Canyon Road, had described Olsen's eyes "as cold, . . . as intentional."[18]  VRP

---

[18] The prosecutor also twice argued that Gamm described Olsen's eyes as "evil."  VRP (Oct. 2, 2015) at 2250, 2255.  These comments mischaracterized Gamm's testimony and are analyzed in the next section.

(Oct. 2, 2015) at 2250. The prosecutor also argued that Olsen's "own intent was to commit death [sic]" and that Olsen "didn't care" that other drivers were endangered. VRP (Oct. 2, 2015) at 2255. This argument was proper because it derived from Gamm's description of Olsen's eyes as "cold, intentional, wanting to hurt something" and Gamm's own fear that he would be struck by the bullets. VRP (Sept. 22, 2015) at 1233.

Fourth, Olsen claims that the prosecutor went beyond the trial evidence when he argued that Olsen "didn't care" that he was firing into a car with three occupants. VRP (Oct. 2, 2015) at 2254. But the prosecutor's argument was proper because it was based on evidence that Pederson and Bryant were in the car with Ward.

Olsen fails to show that the prosecutor mischaracterized the evidence. Accordingly, the prosecutor's arguments set forth above were proper.

3.      NOT ERROR

During closing arguments, the prosecutor stated twice that even an attempted assault could suffice to establish felony murder. This argument was improper because the jury was not instructed about attempted assault. When Olsen objected, the trial court instructed the jury that "the prosecution argued you could consider an attempted assault" but "[y]ou are to disregard this argument on attempted assault." VRP (Oct. 2, 2015) at 2263. The trial court directed the jury to the to-convict instruction for felony murder, count III.

When these misstatements were brought to the trial court's attention, it quickly gave a curative instruction that not only instructed the jury to disregard that statement but focused the jury

on the to-convict instruction given. We hold that the two misstatements about attempted assault were not prejudicial because there was simply no error that occurred.[19]

4.      NOT PREJUDICIAL

We agree with Olsen that two of the prosecutor's comments were improper; however, as discussed below, these instances were not prejudicial.

Twice during closing, the prosecutor mischaracterized Gamm's testimony and said that Olsen's eyes looked "evil" when Olsen shot Ward. VRP (Oct. 2, 2015) at 2250, 2255. This went beyond Gamm's testimony, which was that Olsen looked "cold, intentional, wanting to hurt something." VRP (Sept. 22, 2015) at 1233.

Because Olsen did not object, the "evil" comments had to be so flagrant and ill intentioned that no instruction could cure any prejudice. *See Glasmann*, 175 Wn.2d at 704. In other cases, we have reversed and held that conduct was flagrant and ill intentioned where the prosecutor's comments permeated closing argument and repeatedly misstated the law or were inflammatory and deliberately designed to persuade the jury to convict the defendant based on fabrication. *See State v. Venegas*, 155 Wn. App. 507, 524-25, 228 P.3d 813 (2010); *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988); *State v. Pierce*, 169 Wn. App. 533, 556, 280 P.3d 1158 (2012). Here, however, the improper argument consisted of two misstatements during a lengthy, otherwise proper closing argument. Evaluated in context, the arguments were not so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice.

---

[19] Olsen relies on *State v. Fisher* in which our Supreme Court reversed for prosecutorial misconduct because there was a substantial likelihood that the misconduct, to which the defendant objected, affected the jury. 165 Wn.2d 727, 748-49, 202 P.3d 937 (2009). Here, in contrast, there was simply no likelihood that the misconduct to which Olsen objected affected the jury.

E.  INEFFECTIVE ASSISTANCE OF COUNSEL

1.  LEGAL PRINCIPLES

We review de novo claims of ineffective assistance of counsel, which present mixed questions of law and fact. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail, the defendant must show that his attorney's performance was deficient and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If either prong of the test is not met, the defendant's ineffective assistance of counsel claim fails and the inquiry ends. *Strickland*, 466 U.S. at 697.

Deficient performance is that which falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Conduct that can be characterized as a legitimate trial strategy or tactic is not deficient. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

2.  LESSER-INCLUDED OFFENSES

Olsen asserts that his counsel rendered ineffective assistance when he failed to request a first or second degree manslaughter instruction. We disagree.

a.  *STATE V. WORKMAN* TEST

First, applying the test from *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978), we hold that had he requested it, Olsen was entitled to an instruction on first degree, but not second degree manslaughter.

Whether a defendant is entitled to a lesser-included offense instruction is determined by the two-pronged *Workman* test. Under the first prong, the elements of first and second degree

42

manslaughter are necessary elements of premeditated murder.[20] *State v. Guilliot*, 106 Wn. App. 355, 367, 22 P.3d 1266 (2001). Under the second prong, the evidence must support an inference that the lesser crime was committed rather than the greater crime. *State v. Henderson*, 182 Wn.2d 734, 742, 344 P.3d 1207 (2015).

Premeditated murder occurs when one "[w]ith a premeditated intent to cause the death of another person . . . causes the death of such person or of a third person." RCW 9A.32.030(1)(a). First degree manslaughter occurs when one "recklessly causes the death of another person." RCW 9A.32.060(1)(a). A person acts recklessly if he "knows of and disregards a substantial risk that a wrongful act may occur" and that disregard "is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).

Second degree manslaughter occurs when one "with criminal negligence . . . causes the death of another person." RCW 9A.32.070(1).

> A person is criminally negligent or acts with criminal negligence when [he] fails to be aware of a substantial risk that a wrongful act may occur and [his] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

RCW 9A.08.010(1)(d).

The evidence in this case supports giving the lesser-included offense instruction of first degree manslaughter. Olsen testified that he fired backward, over his shoulder, when he was fleeing from Ward. If believed, this testimony would support that Olsen acted recklessly rather than with a premeditated intent because Olsen knew of and disregarded a substantial risk that he

---

[20] The lesser-included offense needs to be a necessary element of at least one of the charged offenses, but it does not need to be a lesser-included offense of all three charged offenses. *Condon*, 182 Wn.2d at 318-19.

would kill Ward and in doing so grossly deviated from the conduct of a reasonable person in that situation. *See* RCW 9A.08.010(1)(c).

However, there was no evidence to support that Olsen acted negligently when he shot Ward. Olsen's version of events was based on self-defense and not that he was unaware of the risk that he would kill Ward. *See* RCW 9A.08.010(1)(d).

Thus, under *Workman*, Olsen was entitled to request a first degree manslaughter instruction but not to a second degree manslaughter instruction. Because Olsen was not entitled to a second degree manslaughter instruction, it was objectively reasonable to decide against requesting such an instruction. His ineffective assistance of counsel argument related to a second degree manslaughter instruction accordingly fails. Next, we determine whether or not declining to request the first degree manslaughter instruction was a legitimate trial strategy.

      b.      ALL OR NOTHING APPROACH

Failure to request a lesser-included offense instruction is not deficient performance if the decision is part of an "all or nothing approach." *Grier*, 171 Wn.2d at 39. In *Grier*, the defendant charged with second degree murder argued justifiable homicide as a defense. 171 Wn.2d at 28. On appeal, the defendant claimed that it was ineffective assistance of counsel to not request instructions on first and second degree manslaughter. *Grier*, 171 Wn.2d at 26-27, 29. Regarding the legitimacy of an all or nothing approach, the *Grier* court explained,

> A defendant who opts to forgo instructions on lesser included offenses certainly has more to lose if the all or nothing strategy backfires, but she also has more to gain if the strategy results in acquittal. Even where the risk is enormous and the chance of acquittal is minimal, it is the defendant's prerogative to take this gamble, provided her attorney believes there is support for the decision. . . . [A] criminal defendant who genuinely believes she is innocent may prefer to avoid a compromise verdict, even when the odds are stacked against her. Thus, assuming that defense counsel has consulted with the client in pursuing an all or nothing approach, a court should

> not second-guess that course of action, even where, by the court's analysis, the level
> of risk is excessive and a more conservative approach would be more prudent.

171 Wn.2d at 39. *Grier* held that the defendant had not received ineffective assistance of counsel because she could not meet her burden to show deficient performance. 171 Wn.2d at 43.

At the outset, there is nothing in the record to show that Olsen wanted his attorney to request a manslaughter instruction. Thus, "we must proceed on the basis that defense counsel consulted with" Olsen about the decision not to request a first degree manslaughter instruction and that he agreed. *Grier*, 171 Wn.2d at 30.

Olsen fails to meet his burden to show that he received ineffective assistance of counsel. Not requesting the manslaughter instruction was conceivably part of a legitimate all or nothing strategy to obtain an acquittal. As in *Grier*, here Olsen's trial strategy was to argue self-defense, which was a defense to all charged crimes. Olsen knew that Ward had a violent, deadly reputation and was likely armed. Olsen said that he went to the Canyon Road shopping center to talk to Ward and to get the stolen truck back. And Olsen claimed that he saw Ward raise a gun and thought that Ward was chasing him when Olsen shot at Ward. Thus, as in *Grier*, "acquittal was a real possibility, albeit a remote one." 171 Wn.2d at 43.

Olsen fails to show that not requesting a first degree manslaughter instruction was objectively unreasonable. Rather, the decision was conceivably part of a legitimate trial strategy to obtain an acquittal. Accordingly, we reject Olsen's ineffective assistance of counsel claim.

3.     VOIR DIRE

Olsen alleges that during voir dire, it was ineffective assistance of counsel not to excuse potential juror number 25 for bias or to seek a new jury panel (1) because jurors discussed a "gut

feeling" about his guilt and (2) because of the venire's age and economic status. VRP (Sept. 14, 2015) at 319. We disagree with both arguments.

A juror must do more than give equivocal answers to be removed when challenged for cause; the juror must be unable to set aside preconceived ideas. *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

First, during the prosecutor's questioning of the venire, the prosecutor stated the following:

Is there anyone who has such -- and juror number 59, and I'm going to steal from what you said earlier today during individual questioning, had such a gut reaction, had such a just kind of feeling in their stomach, that as they sit here right now they're thinking . . . Olsen is presumed innocent, but . . . I can't really give that any meaning.

VRP (Sept. 14, 2015) at 397. Olsen argues that the "gut feeling" statement during individual questioning thus tainted the entire venire and that his attorney should have sought a new panel of jurors. To the contrary, rather than using it to taint the venire, the prosecutor used the "gut feeling" statement to examine potential jurors who may have formed a preconceived notion that Olsen was guilty. Olsen's attorney's failure to request a new panel was thus objectively reasonable and not deficient performance.

Second, during Olsen's questioning, a potential juror discussed the definition of a "peer" and stated, "If you look around here, you've got a young man being accused and you've got a lot of older people. . . . I only worry about when it comes to peers. Like you're saying, the only people here are people who can afford to be here." VRP (Sept. 14, 2015) at 407-09. Olsen's counsel used the juror's concerns to catalyze a discussion about the right to a jury of one's peers, in which other jurors explained that they thought it was good to have a "mixture of different kinds of people . . . because everybody has opinions" and that there were "other ways that [they] can relate to the

46

people in the room" than age. VRP (Sept. 14, 2015) at 409. Olsen argues that it was ineffective assistance of counsel not to request a new panel because the juror's concerns tainted the venire. To the contrary, the discussion's context reveals no prejudice to Olsen. Accordingly, it was objectively reasonable to not request a new panel of jurors. Olsen fails to show deficient performance in this regard.

Third, at another point in Olsen's questioning, juror number 25, who became the presiding juror, expressed frustration about her previous experience on a jury because the defendant had "walked" when the jury could not agree on a verdict. VRP (Sept. 14, 2015) at 400. When Olsen questioned this juror, she showed that she did not have preconceived ideas. She clarified that she understood there "needs to be a consensus" and that "if there's not a consensus . . . you move on." VRP (Sept. 14, 2015) at 417. Because juror number 25 did not evince preconceived ideas that she could not set aside, it was objectively reasonable for Olsen not to attempt to have juror number 25 excused.

Olsen's arguments about ineffective assistance during voir dire all fail because he does not establish that his counsel's performance was deficient.

4. FAILURE TO MOVE FOR MISTRIAL

Olsen argues that his counsel should have moved for a mistrial when a member of the audience "yelled out the answer[] to a testifying witness." SAG at 29. We hold that it was objectively reasonable for counsel not to move for a mistrial.

A mistrial motion should be granted only if the defendant has been so prejudiced that nothing short of a new trial can insure the defendant receives a fair trial. *State v. Rodriguez*, 146 Wn.2d 260, 270, 45 P.3d 541 (2002).

47

Olsen's argument refers to an instance during Ward's aunt's testimony when the aunt, describing Ward's relatives in the in-life photograph of Ward, could not recall Ward's stepsister's last name. An audience member "yelled out" the name. VRP (Sept. 15, 2015) at 583.

There is no conceivable prejudice to Olsen resulting from the audience member answering the question about Ward's stepsister's last name. Accordingly, there was no likelihood that the trial court would have granted a mistrial motion on this basis. *See Rodriguez*, 146 Wn.2d at 270. It was not deficient performance for Olsen's attorney to fail to move for a mistrial when the motion would not have been granted, and thus Olsen's claim of ineffective assistance fails.

5.      ACCOMPLICE TESTIMONY LIMITING JURY INSTRUCTION

Olsen argues that his counsel should have requested WPIC 6.05, the accomplice testimony limiting instruction. We hold that Olsen fails to show that his counsel's performance was deficient.

> Testimony of an accomplice, given on behalf of the [State] should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

WPIC 6.05.[21] Failure to request the instruction is not ineffective assistance of counsel if other trial evidence substantially corroborates the accomplice testimony. *State v. Sherwood*, 71 Wn. App. 481, 485, 860 P.2d 407 (1993).

Olsen does not specify which accomplice's testimony would have supported a limiting instruction. At his trial, Kaplin, Stevenson, and Lind all testified for the State. They described the events leading up to the shooting, including Olsen's request that they arrange for Ward to wait at

---

[21] A comment to this instruction states that it is "not limited to those cases in which a witness is charged as an accomplice." WPIC 6.05, cmt. at 197.

the Canyon Road shopping center. For his part, Olsen testified that Lind "told [him]" to go to the Canyon Road shopping center and said that he could meet Ward there to recover his truck. VRP (Oct. 1, 2015) at 2078. In closing, the prosecutor referenced Kaplin's, Stevenson's, and Lind's testimony as evidence of Olsen's premeditated intent to kill Ward.

But Stevenson's, Kaplin's, and Lind's accounts of February 16 were substantially corroborated. The State provided testimony of extensive communication between Stevenson and Kaplin, Lind, Olsen, and Ward on February 16, and an exhibit summarizing the phone records of Stevenson and Kaplin, Lind, Olsen, and Ward on that day. By showing extensive communication between Stevenson and Kaplin, Lind, Olsen, and Ward on February 16, the State substantially corroborated the testimony of Stevenson, Kaplin, and Lind about events leading up to the shooting, including their part in orchestrating the scheme. Further, Pederson, one of the passengers in Ward's car, corroborated Stevenson's and Kaplin's testimony that they met with Ward on February 16 and directed him to wait at the Canyon Road shopping center.

Because there was substantial corroboration of Stevenson's, Kaplin's, and Lind's testimony, counsel's failure to request WPIC 6.05 was not ineffective assistance. *See Sherwood*, 71 Wn. App. at 485.

6.    FAILURE TO CALL INVESTIGATOR

Olsen asserts that counsel was ineffective because he forgot to have Olsen's investigator testify that Pederson had previously stated that Ward carried a gun and had used it to rob people. We disagree.

At trial, when Olsen cross-examined Pederson, Pederson claimed that he could not remember saying that Ward had committed armed robbery in the past and carried a firearm.

49

Olsen's attorney then said, "[A]t some point later on I'll have to put on an investigator just to create a record concerning his interview with him." VRP (Sept. 22, 2015) at 1192. But Olsen's attorney never called the investigator as a witness. Instead, Olsen's attorney called another witness who testified about Ward's reputation for violence and habit of carrying a firearm. Olsen himself also testified that he knew Ward had killed someone, sold drugs, and was generally dangerous.

Because there were other sources that subsequently testified about Ward's dangerousness, commissions of armed robbery, and habit of carrying a gun, it was a legitimate trial tactic not to call Olsen's investigator to testify about Pederson's prior statements. Accordingly, Olsen's ineffective assistance of counsel claim fails.

7.     FAILURE TO QUESTION OR EXCUSE JUROR

Olsen argues that his counsel was ineffective because he should have questioned or sought to have excused a juror[22] who observed Olsen in shackles. We disagree.

"It is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances." *Finch*, 137 Wn.2d at 842. Shackling a defendant tends to prejudice the jury against the accused. *Finch*, 137 Wn.2d at 845. However, a jury's "brief or inadvertent glimpse of a defendant in restraints inside or outside the courtroom does not necessarily constitute reversible error" and does not "rise to the level of a due process violation absent a showing of actual prejudice." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 697-98, 101 P.3d 1 (2004).

---

[22] Olsen argues that juror 4 saw him in shackles and, therefore, should have been excused. But the record does not support that juror 4 observed Olsen in shackles—the prosecutor and Olsen's attorney both agreed that the juror was looking at his cell phone. Accordingly, we reject this argument.

At one point during Olsen's trial, juror 10 "forgot to stay in the jury room" and was sitting on benches outside when Olsen was transported during a recess. VRP (Sept. 17, 2015) at 891-92. Olsen's attorney thought that the juror observed Olsen in shackles. The trial court kept juror 10 separate from the other jurors immediately after and asked Olsen's attorney if he wanted to question her, but Olsen's attorney declined.

Here, one juror potentially saw Olsen in shackles outside the courtroom while Olsen was being transported. Olsen provides no evidence or argument as to any possible prejudice from this potential glimpse of him in shackles. Indeed, although Olsen argues that his counsel should have "questioned" the juror, questioning the juror would have merely served to draw attention to the incident and that Olsen was shackled while being transported. Without any evidence of possible prejudice and in light of the rule that a brief glimpse of a defendant in shackles is not necessarily reversible error, Olsen fails to show that his counsel's decision not to question or excuse the juror was deficient performance.

8.     FAILURE TO CROSS-EXAMINE LIND, KAPLIN, AND STEVENSON ABOUT PLEA AGREEMENT

Olsen argues that his counsel was ineffective because he should have cross-examined Lind, Kaplin, and Stevenson to bring out that they had received plea deals for their testimony. We hold that counsel's performance was not deficient.

Before trial, Olsen's attorney filed a motion in limine to bar testimony by the State about the plea deals. He referenced the plea agreements' requirement that the witnesses testify truthfully and claimed that discussion of the plea deals would bolster these witnesses' credibility and constitute improper vouching. This was a reasonable trial tactic and thus, his claim of ineffective assistance fails on this basis.

9.      FAILURE TO CROSS-EXAMINE LIND ABOUT CRIMINAL HISTORY

Olsen argues that his counsel was ineffective because he should have cross-examined Lind about her criminal history.  We disagree.

In general, prior convictions may be used to attack a witness's credibility only if the witness has been convicted of a crime punishable by more than one year in prison or involving dishonesty or false statement.  ER 609(a).

Lind apparently had a domestic violence related fourth degree assault conviction and third degree malicious mischief conviction from 2006.  Fourth degree assault and third degree malicious mischief are both misdemeanors and neither is a crime of dishonesty or false statement.  *See* former RCW 9A.36.041 (1987); RCW 9A.48.090.  Accordingly, these convictions were not admissible under ER 609(a) to impeach Lind's credibility.  Because the trial court would not have allowed inquiry into Lind's prior convictions, Olsen fails to show that his counsel performed deficiently in this regard.

F.  JURY INSTRUCTIONS

Olsen argues that the trial court erred when, over his objection, it (1) added additional language to clarify WPICs 2.04 and 2.04.01, (2) declined to give WPIC 17.02 regarding lawful force, and (3) did not give a multiple assailant instruction.  His arguments related to WPICs 2.04 and 2.04.01 and the multiple assailant instruction fail, and we do not reach the issue related to WPIC 17.02.

1.      WPICs 2.04 AND 2.04.01

Olsen argues that the trial court erred when it added language to WPICs 2.04.01 and 2.04 over Olsen's objection.  We disagree.

Absent a legal error, we review a trial court's decision regarding an instruction's wording for an abuse of discretion. *In re Det. of Taylor-Rose*, 199 Wn. App. 866, 880, 401 P.3d 357 (2017), *review denied*, 189 Wn.2d 1039 (2018).

WPIC 2.04.01 defines "great personal injury" for the purpose of justifiable homicide: "Great personal injury means an injury that the slayer reasonably believed, in light of all the facts and circumstances known at the time, would produce severe pain and suffering if it were inflicted upon either the slayer or another person." WPIC 2.04 defines "great bodily harm" for the purpose of assault: "Great bodily harm means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ."

Here, the jury was given both the justifiable homicide instruction, which referred to the defendant's belief that the person slain intended to inflict death or "great personal injury," and the first degree assault instruction, which referred to the defendant's intent to inflict "great bodily harm." CP at 519, 527. Fearing that the jury would be confused by instructions defining both "great personal injury" and "great bodily harm," the trial court added some language to WPIC 2.04.01 and WPIC 2.04. VRP (Sept. 30, 2015) at 2033. To WPIC 2.04.01, the trial court added that great personal injury applied "[w]hen considering self-defense." CP at 527. And to WPIC 2.04, the trial court added that great bodily harm applied "[w]hen considering the crime of assault in the first degree." CP at 520.

The trial court's modifications properly tied the definitions of "great personal injury" and "great bodily harm" to justifiable homicide and first degree assault. CP at 520, 527. In making these modifications, the trial court did not abuse its discretion.

2.      WPIC 17.02

Olsen next argues that the trial court erred when it declined to give his requested WPIC 17.02 in addition to the court giving WPIC 16.02.  We decline to reach this argument.

WPIC 16.02 defines justifiable homicide, a defense to murder.  Homicide is justifiable if "the slayer reasonably believed that the person slain . . . intended" to commit a felony or inflict death or great personal injury.  WPIC 16.02.  WPIC 17.02, in contrast, describes lawful force for charges other than homicide.  Force is lawful if the defendant reasonably believed he was "about to be injured" in preventing or attempting to prevent an offense against the person.  WPIC 17.02.

Olsen argues that the trial court erred because it should have given WPIC 17.02 in addition to WPIC 16.02.  The trial court declined to do so and instructed the jury only under WPIC 16.02.  Any error in this decision would have affected Olsen's conviction only for felony murder, count III, which was vacated.  Accordingly, we do not reach this issue.

3.      MULTIPLE ASSAILANTS INSTRUCTION

Olsen argues that the trial court erred because it did not instruct the jury that Olsen faced multiple assailants; he relies upon *State v. Irons*, 101 Wn. App. 544, 4 P.3d 174 (2000).  We disagree.

We review a trial court's decision whether to give a jury instruction for an abuse of discretion if the decision was based on a factual determination.  *Condon*, 182 Wn.2d at 315-16.  In *Irons*, the self-defense instructions given did not make clear to the jury that it could consider the fact that the defendant was faced with multiple assailants.  101 Wn. App. at 552.

During the jury instruction conference, Olsen unsuccessfully argued that the instructions should include language that Olsen could have reasonably feared Ward's passengers.  The trial

court was within its discretion not to include language about perceived danger from others because, at Olsen's trial, there was no evidence that he felt threatened by Pederson or Ward. Olsen's testimony was that it was *Ward* who he knew to be dangerous, saw with a weapon, thought would start shooting, and was driving the car.

*Irons* is not to the contrary because in that case, there was evidence that the defendant actually felt threatened by multiple assailants. Accordingly, we reject Olsen's claim.

4.     LIMITING INSTRUCTION

Olsen appears to assert that the trial court erred because it did not give a limiting instruction about Kaplin's testimony. We disagree.

It is well settled that the trial court is not required to sua sponte give a limiting instruction. *State v. Russell*, 171 Wn.2d 118, 123, 249 P.3d 604 (2011).

Kaplin, one of the State's witnesses who participated in the "set up" of Ward, claimed not to know that Olsen would shoot Ward on February 16. The prosecutor then asked Kaplin about his statements to investigators before trial, implying that Kaplin was not credible. In response to the prosecutor's questions, Kaplin admitted that he had not initially been truthful when he spoke to law enforcement.

Olsen then objected that it was irrelevant whether or not Kaplin had lied to law enforcement about his knowledge of events in the case. The trial court overruled the objection, although it stated that "[a]pparently at some point I have to provide the jury with a limiting instruction specifying the purpose of the evidence that is going to be allowed." VRP (Sept. 16, 2015) at 785. Kaplin subsequently explained that he was initially not truthful because he was "nervous and scared" when he heard that Ward had been killed. VRP (Sept. 16, 2015) at 786. But Kaplin never

55

testified that he had previously told investigators that he knew Olsen was going to shoot Ward. No party requested a limiting instruction nor was one provided to the jury.

Because no party requested the limiting instruction and because a trial court is not required to give a limiting instruction sua sponte, we hold that there was no error. *See Russell*, 171 Wn.2d at 123.

## G. MISMARKED VERDICT FORM

Olsen argues that the jury failed to find an element of the offense because it wrote his name in the blank for "[g]uilty" or "[n]ot [g]uilty" on the verdict, then crossed his name out and wrote "[g]uilty." CP at 536, 540, 542. We disagree.

Although the State had the burden to prove that *Olsen* was the defendant, the verdict form does not contain the elements of the offense. Olsen was the only defendant in his case, and the "[t]o-convict" instructions listed as an element for the State to prove that "the defendant" committed the crime. *E.g.*, CP at 508. It is clear that the jury found *Olsen* guilty, even if they were confused over whether to write his name or the word "guilty" on the verdict form.

## H. LOCATION OF THE OFFENSE

Olsen argues that the State failed to prove that the crime occurred in Washington because Stevenson did not state as much in his testimony. We disagree.

The State provided ample evidence to establish that all events except part of Olsen's subsequent flight occurred in Washington—multiple witnesses testified to this fact. Olsen's argument lacks merit.

I. CROSS-EXAMINATION OF OLSEN

Olsen asserts that the trial court erred because it allowed the State to cross-examine him concerning his subsequent flight to Idaho, which was beyond the scope of his direct testimony.[23] We hold that the trial court did not err.

We review de novo whether a defendant waived his right against self-incrimination by taking the stand; otherwise, we review a ruling on the scope of cross-examination for an abuse of discretion. *State v. Hart*, 180 Wn. App. 297, 303-04, 320 P.3d 1109 (2014). When an accused takes the stand voluntarily, he waives the right against self-incrimination as to matters concerning which cross-examination is otherwise proper. *Hart*, 180 Wn. App. at 304. But inquiry into attenuated matters that subject the defendant to criminal liability is not allowed. *Hart*, 180 Wn. App. at 304.

Olsen limited his direct testimony to events up to when the shooting occurred and did not testify about his subsequent flight to Idaho. Over Olsen's objection, the trial court allowed the State to inquire into subjects bearing on Olsen's consciousness of guilt, namely the condition of the second rental truck, his throwing away his handgun and changing his phone number, his flight to Idaho, and his statements to Clark that he did what he had to do to keep his family safe. Olsen claimed that it violated his right against self-incrimination to ask him about events after the shooting because "in theory" the events "could be separate charges." VRP (Oct. 1, 2015) at 2052.

---

[23] Olsen also appears to argue that the trial court's decision improperly shifted the burden to him to disprove that he acted in self-defense. It is unclear how allowing the State to inquire into events that occurred after the shooting shifted to Olsen the burden to disprove self-defense.

Evidence of his flight and destruction of evidence was relevant as evidence of consciousness of guilt. Thus, the trial court was within its discretion to allow the State to inquire about these topics. *See Hart*, 180 Wn. App. at 304. Further, there is nothing in our record to support that Olsen's testimony subjected him to potential criminal liability for charges other than homicide. Accordingly, Olsen fails to show that his right against self-incrimination was violated.

## J. JURY POLLING

Olsen argues that the trial court erred when it denied his request to individually poll the jurors. We disagree.

"When a verdict or special finding is returned and before it is recorded, the jury shall be polled at the request of any party or upon the court's own motion. If at the conclusion of the poll, all of the jurors do not concur, the jury may be directed to retire for further deliberations or may be discharged by the court." CrR 6.16(a)(3).

At Olsen's trial, when he requested to individually poll jurors, the trial court asked the jurors as a group whether they agreed with the verdict and asked each individual juror to raise his or her hand. CrR 6.16(a)(3) does not specify how the jurors must be polled. Here, the record shows that all parties and the trial court agreed that each juror raised his or her hand for all verdicts. Olsen fails to show that the trial court failed to comply with the court rule or that polling the jury in this way prejudiced him in any manner, given that each juror responded individually to the court's polling.

## K. CUMULATIVE ERROR

Olsen argues that the cumulative effect of the errors in his case merits reversal. We disagree.

Cumulative error may apply where each error, standing alone, is harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). It does not apply where the errors are few and have little impact on the trial's outcome. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

We hold that it was prosecutorial misconduct to state that an attempted assault could suffice to establish felony murder and to mischaracterize Gamm's testimony as saying that Olsen looked "evil." Further, we assume without deciding that it was error to admit evidence that Olsen was arrested in Idaho and evidence from Boutelier's cell phone. However, even taken cumulatively, these errors were few and had little impact on the trial's outcome. We reject Olsen's cumulative error claim.

## L. MATTERS OUTSIDE THE RECORD

Several of Olsen's additional arguments depend on matters outside the record. Where allegations rest upon evidence outside the record on review, we cannot address the allegations on direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

First, Olsen argues that prejudicial error occurred, in violation of the confrontation clause and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), or constituting juror tampering, when a juror found information on a court-provided note pad. The record contains only the trial court's mention that a juror found "a little bit of information from an old case" in his trial court-provided notepad and that neither party was "concerned about it." VRP (Sept. 17, 2015) at 891. Without knowing what information the juror found in the notepad, we cannot determine the merits of this claim because it relies upon matters outside the record.

Second, Olsen asserts that failure to disclose a plea agreement between Bryant and the State violated *Brady*. The record contains no reference to a plea agreement between Bryant and

the State before September 21, 2015. On September 21, during trial, the State moved for an order granting Bryant immunity for his testimony. Until that point, according to Olsen's attorney, Bryant had asserted that he would not be testifying in the matter. Because we cannot discern whether the State withheld evidence about whether Bryant having a plea agreement before September 21, this matter relies upon alleged evidence outside the record.

Third, Olsen asserts that failure to disclose a plea agreement between Pederson and the State violated *Brady*. There is nothing in the record to show whether Pederson had a plea agreement with the State or if he did, that the State failed to disclose this information. This, again, relies upon matters outside the record.

Fourth, Olsen argues that he had a right to be present when the trial court addressed the jury, including when they were sent to deliberate and when instructions were read, that was violated. But it is unclear from the record whether Olsen was, in fact, present when jury instructions were read or when the jury was sent to deliberate. This relies upon matters outside the record.

Fifth, Olsen argues that his attorney should have brought out Kaplin's and Stevenson's criminal histories and probation status. Olsen does not explain what crimes Kaplin or Stevenson had committed that his counsel should have argued were admissible. And after a diligent search of the record, these facts appear to be outside the record.

## M. Too Vague To Address

Olsen argues that the trial court erred when it did not instruct the jury and explain "about eyewitness testimony." SAG at 33. We decline to address this issue because it is too vague to address.

## N.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Lastly, Olsen asserts in his SAG that his appellate counsel rendered ineffective assistance. He reasons that his SAG raises meritorious issues that his appellate counsel overlooked.  But even if Olsen's SAG raised meritorious issues, we would grant relief, and accordingly his direct appeal would succeed.  Olsen can show no possible prejudice from failure to raise SAG issues in the appellant's brief, and we reject his claim of ineffective assistance of appellate counsel.

## PART TWO – PERSONAL RESTRAINT PETITION

In his PRP, Olsen provided evidence that the State's witness Bryant recanted his trial testimony.  Olsen argued that the recantation merits a new trial under RAP 16.4(c)(3).  Based on our initial review, we remanded for a reference hearing, primarily for the trial court to rule on the credibility and reliability of Bryant's recantation testimony.  But Bryant did not testify and instead he claimed the protection of the Fifth Amendment.  Therefore, the trial court was unable to make any determination regarding the credibility and reliability of Bryant's testimony.  Thus, Olsen has failed to show he is entitled to a new trial based on new admissible evidence.

In his post-reference hearing briefing, Olsen argues that (1) the superior court's findings of fact are not supported by substantial evidence, (2) the superior court erred by sustaining Bryant's invocation of the Fifth Amendment, (3) Olsen is entitled to a new trial based on the recantation letter, (4) the prosecutor's office committed a *Brady* violation by delaying reaching a final plea agreement with Bryant, and (5) the State's use of an on-site simulator device violated the Fourth Amendment.

We hold that (1) the superior court's findings of fact regarding the recantation letter are superfluous, (2) the superior court did not err by sustaining Bryant's Fifth Amendment invocation,

(3) Olsen failed to establish that he has new admissible, reliable, and credible evidence, and (4) Olsen's *Brady* violation claim is outside the scope of the reference hearing and therefore is not considered.[24]  Accordingly, we hold that Olsen is not entitled to a new trial.

## I. RECANTATION FACTS

In support of his PRP, Olsen provided a letter and statement from Bryant, written in November 2015, within a month after Olsen's sentencing.  Bryant wrote Olsen's mother to say that after he learned about Olsen's lengthy sentence, "I felt respons[i]ble for a false testimony [sic] so I took the liberty to write a truthful statement."  PRP at 11.  Olsen's mother sent Bryant's letter to Olsen's trial attorney.

In his statement, Bryant recants his trial testimony and states that he does so "under penalty of perjury."  PRP at 14.  He states that he and Pederson "lied to police," and Bryant "lied at Mr. Olsen's trial" because Bryant feared that unless he testified favorably for the State, he "would not receive a favorable plea bargain on . . . unrelated robbery charges."  PRP at 12.

Contrary to Bryant's trial testimony, his statement sets forth that when Olsen followed Ward, Ward "pull[ed] a gun out and point[ed] [it] back between the seats at the truck behind" them.  PRP at 13.  Bryant then heard gunshots.  At the intersection,

> [Ward] continued driving and drove through a red light and [Pederson] & I told [Ward] to go left.  [Ward] started to go left until he saw the guy in the truck [Olsen] go right.
> [Ward] then swerved right to go after the guy in the truck and we ended up in oncoming traffic.  At that point I was so [afraid] we were going to crash that I looked up and the last thing I saw was [Ward] pointing his gun at the truck, like as to shoot through the windshield.  At that moment is when I heard the truck fir[ing] more shots.  That's when I believe [Ward] to be shot.

---

[24] We addressed Olsen's argument regarding *Carpenter* in the direct appeal portion of our decision, *supra*.

. . . .
The truth of the matter is that all Mr. Olsen did was follow us out of the parking lot and he never fired his gun until Robert Ward pointed his gun at him and was trying to get it to fire.
Olsen ended up being the one who was fleeing with [Ward] chasing him. Not the other way around. If Mr. Olsen didn't defend himself it would [have] been bad for him.

PRP at 13-14.

Olsen also provided his trial attorney's letter to his appellate counsel regarding Bryant's recantation. Olsen's trial attorney said that in April 2016, he interviewed Bryant, who admitted that he lied at Olsen's trial and claimed to have written the recantation statement of his own free will. Olsen's trial attorney then provided Olsen's appellate attorney with the statement.

Olsen filed a motion for relief from judgment under CrR 7.8(b)(2). The trial court transferred Olsen's motion to this court as a PRP, and we consolidated it with Olsen's direct appeal. After review, we concluded that "Olsen has met his threshold burden of providing competent and admissible evidence that creates a factual basis for his allegations," but we could not determine Bryant's credibility from the record. Order Transferring Pet. to Superior Ct. for a Reference Hr'g, *State v. Olsen*, Consol. Nos. 48294-1-II, 49554-6-II, at 7 (Wash. Ct. App. Feb. 7, 2018).

On February 7, 2018, we issued an "Order Transferring Petition to Superior Court for a Reference Hearing" stating,

The superior court shall enter findings of fact regarding whether Bryant testifies consistently with his statement submitted in support of Olsen's PRP and whether Bryant's recantation is credible and reliable. In doing so, the superior court shall focus upon the circumstances affecting reliability and credibility set forth in [*In re Personal Restraint of Clements*, 125 Wn. App. 634, 644 n.3, 106 P.3d 244 (2005)], and *In re Personal Restraint of Spencer*, 152 Wn. App. 698, 715, 218 P.3d 924 (2009), and any other circumstances relevant to the inquiry.

63

Order Transferring Pet. to Superior Ct. for a Reference Hr'g, *State v. Olsen*, Consol. Nos. 48294-1-II, 49554-6-II, at 8 (Wash. Ct. App. Feb. 7, 2018).

On March 21, the parties appeared for the reference hearing. Bryant had an attorney who said that Bryant would assert his Fifth Amendment rights to protect himself from perjury.

Olsen called Bryant as a witness. The trial court did not allow Bryant to assert a blanket Fifth Amendment privilege, but rather allowed him to assert the Fifth Amendment on a question-by-question basis. Bryant stated that he was currently serving a 108-month sentence for first degree robbery. Bryant acknowledged that he received a mitigated exceptional sentence for the robbery case by agreement with the State. When asked if he received an exceptional sentence down because of his testimony against Olsen, Bryant responded, "I don't know." 1 VRP (May 21, 2018) at 51. The superior court entered copies of the plea documents as exhibits.

According to exhibits 2 and 3, Bryant received the mitigated exceptional sentence on October 27, 2015. Olsen was sentenced a few days earlier on October 23. For the robbery charge, Bryant had an offender score of 9 plus and he received an exceptional sentence of 108 months "which is 21 months less than the low end of the guideline range of 21 months." Ex. 3 at 2. The prosecutor stated,

> [Bryant] has testified in a murder case during which he had been a passenger in a car being driven by the victim and hence witnessed the murder. There was no agreement or arrangement requested by [Bryant] nor granted by the State in relation to this testimony. However the murder trial has now taken place and I have inquired from the [deputy prosecuting attorney] who handled the

murder case to find out what the case was about, to what extent did the Defendant testify, and to what extent did the Defendant place himself at risk by doing so.[25]

Ex. 3 at 2. Also included in exhibit 2 was an order to seal the (1) prosecutor's statement regarding amended information and the (2) findings of fact and conclusions of law for the exceptional sentence.

Bryant asserted his Fifth Amendment privilege when asked about the recantation letter and his interview with the attorney regarding the letter. Bryant denied ever meeting Olsen.

Olsen then called the private investigator who was present during the phone interview with Bryant regarding the recantation letter. The private investigator said that during the phone interview the person identified himself as Bryant and he ratified what was said in the letter. According to the private investigator, Bryant said, "[N]o one had threatened him or had asked him to change his story and that he wrote the letter of his own freewill." 1 VRP (May 21, 2018) at 67. The recantation letter was admitted as exhibit 1.

Olsen's attorney requested that the superior court grant Bryant immunity, but the superior court denied the request. The State moved to admit exhibit 18 for the purposes of the hearing, which is a transcribed interview of Bryant taken by detectives a few days after the shooting.

The day after the conclusion of the hearing, the superior court filed its ruling in a letter that contained findings. It found that Bryant's recantation account was not plausible, reliable, or

---

[25] The findings of fact and conclusions of law in support of the sentence also provide, "[Bryant] has cooperated with law enforcement by providing information about what he witnessed. Without requesting anything in return [Bryant] testified recently during the murder case. [Bryant's] testimony was directly relevant and contradictory to the claims made by the murderer in that case." Ex. 3 at 4.

credible. Later, the superior court entered findings of fact that included almost the same findings

as the letter. The findings of fact stated in part,

3.      At the reference hearing, Bryant Ward was called as a witness by petitioner Christopher Olsen.

4.      Bryant Ward invoked his right to not testify in response to most questions posed to him by petitioner's attorney.

5.      Because of this, Bryant Ward did not provide an explanation in court of the circumstances under which he came to author a recantation of his trial testimony or even acknowledge that he did so.

6.      There is credible evidence from witness Michael Dahlstrom that Bryant Ward had previously acknowledged writing the recantation letter during a telephone call in April, 2016.

7.      However, the only evidence of reliability of the recantation is the letter Bryant Ward wrote in November, 2015, while an inmate at the Washington Corrections Center in Shelton, Washington (Ex. 1).

8.      The substance of Bryant's [sic] Ward's recantation letter is much different from his trial testimony, as well as his statements to police two days after the murder. Bryant Ward's trial testimony and statements to police are consistent with one another.

9.      In his recantation letter, Bryant Ward states that his motivation for previously providing false information regarding the shooting in this case stemmed from hope that he might receive leniency from the State for the robbery charges pending against him at that time.

10.     But at the time Bryant Ward provided his recorded statement to police, two days after the shooting, he had yet to commit any of the robberies he would later be charged with.

11.     His claimed motivation for lying at trial is not credible.

12.     Bryant Ward's recantation account is not plausible.

13.     The evidence is overwhelming that petitioner created the confrontation with the victim, and Bryant Ward's recantation letter does nothing to change that.

14.     It is undisputed that Robert Ward never discharged a firearm during this incident, and attempted to rapidly flee the scene of the confrontation.

15.     The point in the car chase at which the two vehicles, one driven by the victim and the other by petitioner, turned onto Canyon Road East is important.

16.     Bryant Ward's recantation letter description of the turn onto Canyon Road East by the victim's vehicle is not plausible.

17.     The timing, distances involved, relative location and speed of the two vehicles are such that the description of these turns provided in the recantation letter are unlikely to be true.

18.    Further, the account of this turn onto Canyon Road East and the order of the two vehicles as described in Bryant Ward's letter is contradicted by the trial testimony of Caroline E. Bennett Benum and Robert Benum.

19.    Petitioner asserts that the account of the vehicle chase provided in Bryant Ward's recantation letter is supported by the trial testimony of the Pierce County Medical Examiner, Thomas Clark. The Court does not find this assertion credible based upon the variables involved regarding the pathway of the bullet in the victim's head, as well as the other evidence presented at trial regarding the pathway of the bullet.

20.    Petitioner bears the burden of proving that Bryant Ward's recantation is reliable and credible.

21.    Bryant Ward's invocation of his right to remain silent is a practical barrier to the petitioner's claim of newly discovered evidence. Bryant Ward's letter, though authentic, is inadmissible hearsay. Without Bryant Ward's testimony in conformity with the letter, there is no new evidence.

22.    The Courts [sic] finds, upon the evidence presented at the reference hearing held May 21 and 22, 2018, that Bryant Ward's recantation is neither reliable nor credible.

CP at 1896-98.

## II. LEGAL PRINCIPLES

We have three options when reviewing a PRP: "(1) [deny] the petition, (2) transfer the petition to a superior court for a full determination on the merits or a reference hearing, or (3) grant the petition." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). A reference hearing is appropriate where the merits of the petitioner's contentions cannot be determined solely on the record because there are disputed material issues of fact. RAP 16.11(b); *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 780, 192 P.3d 949 (2008).

We may grant a PRP if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction." RAP 16.4(c)(3). The RAP 16.4(c)(3) standard is the same as that applied to a motion for a new trial based upon newly discovered evidence. *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001). The petitioner must satisfy a five-factor test

"that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching."

*Reise*, 146 Wn. App. at 781 (quoting *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

A testimonial recantation must be reliable. *State v. Macon*, 128 Wn.2d 784, 804, 911 P.2d 1004 (1996).

A petitioner must provide competent and admissible evidence that provides a factual basis for his allegations. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Bald assertions and conclusory allegations do not suffice. *Rice*, 118 Wn.2d at 886. And if the evidence is based on others' knowledge, the petitioner must present their affidavits or other corroborative evidence, rather than relying on what he thinks those others would say. *Rice*, 118 Wn.2d at 886.

## ANALYSIS

### I. THE TRIAL COURT'S FINDINGS OF FACT ARE SUPERFLUOUS

In our order for a reference hearing, we specifically instructed,

> *The superior court shall conduct a hearing to allow Olsen to present the testimony of recanting witness Bryant, subject to cross-examination. The superior court shall enter findings of fact regarding whether Bryant testifies consistently with his statement submitted in support of Olsen's PRP and whether Bryant's recantation is credible and reliable.* In doing so, the superior court shall focus upon the circumstances affecting reliability and credibility set forth in *Clements*, 125 Wn. App. at 644 n.3, and [*Spencer*, 152 Wn. App. at 715].

Order Transferring Pet. to Superior Ct. for a Reference Hr'g, *State v. Olsen*, Consol. Nos. 48294-1-II, 49554-6-II, at 7-8 (Wash. Ct. App. Feb. 7, 2018) (emphasis added). But Bryant asserted his Fifth Amendment privilege when asked about the recantation letter. Therefore, the superior court could not enter findings of fact "regarding whether Bryant testif[ied] consistently with his statement submitted in support of Olsen's PRP and whether Bryant's recantation is credible and

68

reliable." Order Transferring Pet. to Superior Ct. for a Reference Hr'g, *State v. Olsen*, Consol. Nos. 48294-1-II, 49554-6-II, at 8 (Wash. Ct. App. Feb. 7, 2018). Instead, the superior court issued findings of fact as to whether Bryant's recantation *letter* was credible and reliable based on the record. These findings regarding Bryant's letter are immaterial and superfluous.

We hold that the superior court's findings of fact regarding Bryant's written recantation letter exceed the scope of the order because the order was directed at Bryant's reference hearing testimony and we treat them, accordingly, as superfluous.

## II. FIFTH AMENDMENT

Olsen argues that the superior court erred by sustaining Bryant's invocation of the Fifth Amendment as to the facts contained in the recantation letter. We disagree.

### A. PRINCIPLES OF LAW

Both the Sixth Amendment to the United States Constitution and the Washington Constitution protect a defendant's right to compel a witness's testimony. *State v. Levy*, 156 Wn.2d 709, 731, 132 P.3d 1076 (2006). However, the Fifth Amendment prohibits a person from being compelled to be a witness against himself. *Levy*, 156 Wn.2d at 731. The Fifth Amendment applies when the defendant has "'reasonable cause to apprehend danger from a direct answer.'" *Levy*, 156 Wn.2d at 731-32 (internal quotation marks omitted) (quoting *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980)).

"The danger of incrimination must be substantial and real, not merely speculative." *State v. Hobble*, 126 Wn.2d 283, 290, 892 P.2d 85 (1995). "The answer need only 'furnish a link in the chain of evidence needed to prosecute the witness for a crime.'" *Hobble*, 126 Wn.2d at 290 (quoting *Seventh Elect Church v. Rogers*, 34 Wn. App. 96, 100, 660 P.2d 294 (1983)). The

determination of whether a Fifth Amendment privilege applies to a witness is left to the trial court's discretion. *Hobble*, 126 Wn.2d at 291. This determination is reviewed for an abuse of discretion. *State v. Parker*, 79 Wn.2d 326, 333, 485 P.2d 60 (1971).

A witness cannot make a "'blanket declaration . . . that he cannot testify for fear of self-incrimination.'" *Levy*, 156 Wn.2d at 732 (alteration in original) (quoting *United States v. Gomez-Rojas*, 507 F.2d 1213, 1219 (5th Cir. 1975)). The superior court must inquire into the assertion's legitimacy and the scope may not extend to all relevant questions. *Levy*, 156 Wn.2d at 732. But "[i]f the judge has 'specialized knowledge' of the likely testimony and can determine whether the privilege is properly asserted for that witness, the judge may allow the witness to refuse to answer all questions." *Levy*, 156 Wn.2d at 732.

Perjury consists of a person making inconsistent material statements under oath, knowing one to be false. *See* RCW 9A.72.050.

### B. NOT ERROR TO SUSTAIN THE FIFTH AMENDMENT PRIVILEGE

Olsen relies on the Ninth Circuit case *United States v. Vavages*, 151 F.3d 1185, 1192 (9th Cir. 1998), to argue that the trial court erred in sustaining Bryant's Fifth Amendment privilege. In *Vavages*, the defendant indicated prior to trial that his common law wife, Manuel, was going to testify. 151 F.3d at 1187. Manuel invoked her Fifth Amendment privilege to avoid perjury charges because it "was her belief that her alibi testimony, even if truthful, would subject her to a perjury prosecution." *Vavages*, 151 F.3d at 1192. The trial court permitted a blanket privilege. *Vavages*, 151 F.3d at 1187, 1192. The Ninth Circuit found that the trial court erred, stating,

> "A witness may not claim the privilege of the [F]ifth [A]mendment out of fear that he will be prosecuted for perjury for what he is about to say. The shield against self-incrimination in such a situation is to testify truthfully, not to refuse to testify on the basis that the witness may be prosecuted for a lie not yet told."

*Vavages*, 151 F.3d at 1192 (alterations in original) (quoting *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986) (noting that "[a] witness may, however, claim the privilege if his testimony may suggest that he has already committed a crime, for example, perjury in a prior proceeding")).

The State responds that this case differs from *Vavages* because in this case (1) Bryant was not allowed to assert a blanket Fifth Amendment privilege, and (2) Bryant was not at risk for "'a lie not yet told.'" State's Suppl. Br. to PRP at 11 (quoting *Vavages*, 151 F.3d at 1192). We agree with the State on both of these arguments. The trial court did not allow Bryant to assert a blanket Fifth Amendment claim and if he had testified consistently with the contents of the letter at the reference hearing, his testimony might have suggested that he already committed perjury in his trial testimony.

Olsen further argues, without citing any additional authority, that Bryant was under no realistic threat of a perjury prosecution for clarifying two points of his trial testimony, and the superior court should not have sustained Bryant's assertion. Olsen acknowledges that Bryant's trial testimony differed in two material ways from his "clarification" letter: (1) he testified he did not see Ward with a gun, but later wrote that he saw Ward point a gun at Olsen, and (2) he testified that he believed Olsen was still pursuing them on Canyon Road and later wrote that Olsen ended up fleeing with Ward pursuing him. However, Olsen argues that in light of the rest of the testimony, Bryant's trial testimony was consistent with Olsen's, Pederson's, and the other witnesses' testimony. Additionally, Olsen contends that to the extent Bryant's testimony differed from his letter, it must be read in light of the fact that he was feeling pressure to assist the

prosecution. Olsen also notes that Bryant received immunity for his testimony related to his drug activity.

The State argues that Bryant had already given two inconsistent statements. He testified under oath at trial that he never saw a gun in Ward's vehicle. His recantation letter states "under penalty of perjury" that Ward pointed his gun at Olsen. Ex. 1 at 5. The State claims that if Bryant affirmed one statement that would mean he either committed perjury at the trial or in the recantation letter. The State does not cite to any authority to support this argument.

Perjury consists of a person making inconsistent material statements under oath, knowing one to be false. *See* RCW 9A.72.050. It appears the State is correct that Bryant's testimony could have compelled him to incriminate himself on perjury charges. Thus, Bryant was entitled to rely on the Fifth Amendment, and the trial court did not err in allowing him to do so. We hold that the trial court did not abuse its discretion and thus did not err by sustaining the witness's invocation of his Fifth Amendment privilege.

### III. NEW TRIAL

Olsen argues that he is entitled to a new trial based on the recantation letter. We disagree.

### A. PRINCIPLES OF LAW

We may grant a PRP if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction." RAP 16.4(c)(3). A petitioner must provide competent and admissible evidence that provides a factual basis for his allegations. *Rice*, 118 Wn.2d at 886. The petitioner must satisfy a five-factor test

> "that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching."

*Reise*, 146 Wn. App. at 781 (quoting *Williams*, 96 Wn.2d at 223). A testimonial recantation can be newly discovered evidence meriting a new trial. *See Macon*, 128 Wn.2d at 804. When evaluating whether a recantation would probably change the result of a trial, it must be determined "whether the recantation is reliable." *Macon*, 128 Wn.2d at 804.

"Whether there is independent corroborating evidence to support the recanting witness' original testimony is not a controlling factor" in this inquiry. *Macon*, 128 Wn.2d at 804. "Reliability is the overriding concern and encompasses all relevant circumstances surrounding the recantation, including possible undue influence, coercion, and any other improper motive or influence." *Clements*, 125 Wn. App. at 644 n.3.

As a component of reliability, a trial court must assess credibility. *Clements*, 125 Wn. App. at 644 n.3. The trial court must make "its own determination of the credibility of a recanting withness, whether or not there is corroborating evidence and without regard to whether a jury might find the witness credible." *State v. Ieng*, 87 Wn. App. 873, 880, 942 P.2d 1091 (1997). "Credibility amounts to a threshold determination of plausibility that involves more than the demeanor of witnesses. A credibility determination includes an assessment of evidence in light of its rationality, internal consistency, consistency with other evidence, and common experience." *Clements*, 125 Wn. App. at 644 n.3.

## B.  ADMISSIBLE EVIDENCE

Olsen argues that because Bryant invoked his right to remain silent and because the trial court erroneously sustained that invocation that this court is in the same position it was in before. Olsen says that he was convicted on "questionable testimony" and therefore appears to argue that he is entitled to a new trial. Suppl. Br. of Appellant at 25.

The State argues that this court ordered a reference hearing because the letter was not sufficient to entitle him to relief and after the reference hearing little has changed. Olsen admits, "[B]ecause of Bryant Ward's decision to invoke his right to remain silent and the trial court's erroneous sustaining of that invocation, this Court is largely in the same place it was prior to ordering the reference hearing." Suppl. Br. of Appellant at 24-25. We agree that little has changed.

Olsen notes that the trial court expressed concern that the letter and statement to his attorney and the private investigator were hearsay and were not admissible. Olsen argues that this concern is premature because it is unknown if Olsen would call Bryant at a new trial and it is unknown if Bryant would invoke the Fifth Amendment at a new trial.

We disagree with Olsen that this concern is premature because it is his burden to show that he has new admissible evidence such that he is entitled to a new trial. It is immaterial to discuss what may or might happen at a new trial, until Olsen has established that he is entitled to a new trial.[26]

The basis for Olsen's claim that he is entitled to a new trial is that Bryant's recantation is newly discovered evidence. If Olsen does not intend to call Bryant to testify, or if Bryant is unavailable to testify due to his Fifth Amendment privilege, then there is no new admissible evidence. Thus, there are no grounds to grant a new trial. Accordingly, we reject Olsen's argument.

Olsen also argues that if Bryant's prior trial testimony is admitted as former testimony under ER 804(b)(1), the letter and statement would be admissible as impeachment evidence under

---

[26] The dissent would grant a new trial without requiring Olsen to meet his legal burden to show that he has new admissible evidence. Dissent at 84-85.

ER 806. He also asserts without analysis that it could be admitted as a statement against interest under ER 804(b)(3). The State argues that Olsen has not presented any material or admissible evidence and that it is all hearsay. The State agrees that if Olsen received a new trial, the letter could be used for impeachment. However, evidence that is merely impeaching does not warrant a new trial. *Macon*, 128 Wn.2d at 800. The State is correct. Bryant's recantation letter is hearsay. And impeachment evidence alone is insufficient evidence upon which to grant a new trial.

The State further argues that the trial court properly concluded that the new version of events was not credible or reliable. Thus, the State says that since Olsen has no credible or reliable evidence and cannot show that the trial would have been different, his claim fails.

We agree with the State that since the recantation letter is merely hearsay and that Olsen has not shown that the recantation is credible, reliable, and admissible, a new trial is not warranted.

IV. *BRADY* VIOLATION: OUTSIDE THE SCOPE OF THE ORDER

Olsen argues that the Pierce County Prosecutor's Office committed prosecutorial misconduct and violated *Brady* at trial by purposefully delaying reaching a final plea agreement with Bryant in order to avoid its disclosure to the defense. Olsen relies on plea documents from Bryant's sentencing for unrelated robbery charges to argue that there was circumstantial evidence that Bryant had a quid pro quo agreement with the State to testify favorably at Olsen's trial in exchange for a mitigated exceptional sentence. We hold that Olsen's *Brady* violation claim is outside the scope of the reference hearing order.

We ordered a reference hearing solely on the issue of whether Bryant's testimonial recantation is credible and reliable. Order Transferring Pet. to Superior Ct. for a Reference Hr'g, *State v. Olsen*, Consol. Nos. 48294-1-II, 49554-6-II, at 2 (Wash. Ct. App. Feb. 7, 2018). This *Brady* violation claim is unrelated to the reference hearing and allegedly occurred at or before the trial. Accordingly, Olsen's *Brady* violation claim is outside the scope of the reference hearing order and should not be considered.

### V.  ON-SITE SIMULATOR DEVICE:  OUTSIDE THE SCOPE OF THE ORDER

Olsen argues that the United States Supreme Court in *Carpenter* has held that people have a privacy interest in not having their movements captured through CSLI and use of the equipment absent a warrant is unreasonable under the Fourth Amendment. This issue is also outside the scope of the reference order, but we nonetheless address *Carpenter* in the direct appeal portion of our opinion.

### CONCLUSION

In conclusion, for the direct appeal, we hold that the trial court properly (1) gave the aggressor instruction, (2) denied Olsen's pretrial suppression motion, and (3) allotted voir dire time. Further, we (4) decline to reach Olsen's argument that the evidence was insufficient to convict him of the vacated count, (5) hold that the trial court properly allowed extrinsic evidence under ER 613(b), and (6) reject Olsen's SAG arguments as lacking merit, relying on matters outside the record, or are too vague to address.

For the PRP, we hold that (1) the superior court's findings of fact are superfluous, (2) the superior court did not err by sustaining Bryant's invocation of the Fifth Amendment, (3) Olsen

failed to establish that he is entitled to a new trial, and (4) Olsen's *Brady* violation claim is outside

the scope of the reference hearing. Accordingly, we affirm Olsen's conviction and deny his PRP.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

JOHANSON, J.P.T.

I concur:

SUTTON, P.J.

BJORGEN, J.P.T[*] (dissenting in part) — For the reasons below, I would grant Christopher Olsen's personal restraint petition (PRP), remand for a new trial, and require the trial court to determine the reliability of Bryant Ward's[27] recantation whether or not he testifies. In addition, I disagree with the majority's conclusion that Olsen lacked standing to challenge the use of a cell site simulator (Stringray) to track Nathan Stevenson. However, I agree that there was sufficient evidence apart from information derived through the Stingray to justify arresting Stevenson. Thus, no evidence developed as a result of Stevenson's arrest need be excluded, even if use of the Stingray was unconstitutional.

Olsen was convicted of first degree murder in the death of Robert Ward. The majority opinion ably sets out the conflicting evidence surrounding the killing that was presented to the trial court.

The most forceful evidence against Olsen was the testimony of Bryant and Richard Pederson, the two passengers in Ward's vehicle, and bystander William Gamm. Bryant, riding in the back seat of Ward's vehicle, testified that he heard a dozen gunshots coming from the pickup truck behind Ward's car. The shots began, according to Bryant, within 5 to 10 seconds from when Ward sped out of the parking lot. Bryant testified that he neither heard anyone in Ward's car return fire nor saw a firearm in Ward's car. Pederson testified that when Ward left the parking lot, Olsen began firing at Ward's car, and Ward drew a small handgun at one point but never raised it above his lap.

---

[*] Judge Thomas R. Bjorgen is serving as a judge pro tempore for the Court of Appeals, pursuant to RCW 2.06.150.

[27] Consistently with the majority opinion, this dissent refers to Bryant Ward as Bryant for clarity.

Within a month after Olsen's sentencing, Bryant wrote Olsen's mother a letter recanting his trial testimony "under penalty of perjury." PRP at 12, 14, 18. Bryant stated that he and Pederson "lied to police," and that he "lied at Mr. Olsen's trial" because Bryant feared that unless he testified favorably for the State, he would not receive "a favorable plea barga[i]n on . . . unrelated robbery charges." PRP at 12.

Bryant's letter states that when Olsen followed Ward, Ward "pull[ed] a gun out and point[ed] [it] back between the seats at the truck behind" them. PRP at 13. Bryant then heard gunshots. Bryant's letter further states that when Ward swerved to go after Olsen and ended up in oncoming traffic, Bryant

> looked up and the last thing I saw was [Ward] pointing his gun at the truck, like as to shoot through the windshield. At that moment is when I heard the truck fir[ing] more shots. That's when I believe [Ward] to be shot.
> . . . .
> The truth of the matter is that all Mr. Olsen did was follow us out of the parking lot and he never fired his gun until Robert Ward pointed his gun at him and was trying to get it to fire.
> Olsen ended up being the one who was fleeing with [Ward] chasing him. Not the other way around. If Mr. Olsen didn't defend himself it would have been bad for him.

PRP at 13-14.

As the majority explains in more detail, Olsen's PRP argues that the recantation merits a new trial under RAP 16.4(c)(3). We may grant a PRP under RAP 16.4(c)(3) if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction." To meet this standard, the petitioner must satisfy a five-factor test:

> "the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching."

79

*In re Pers.Restraint of Reise*, 146 Wn. App. 772, 781, 192 P.3d 949 (2008) (quoting *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)). Further, a petitioner must provide competent and admissible evidence that provides a factual basis for his allegations. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

The majority opinion concludes that these standards are not met for two reasons: first, the recantation letter is hearsay and thus is not competent and admissible evidence under *Rice*, and, second, the requisite determination of reliability was not made due to Bryant's invocation of his Fifth Amendment privilege.

Turning first to the evidentiary issue, our order of February 7, 2018, transmitting the PRP to superior court for a reference hearing, concluded that Olsen's petition meets his threshold burden of providing competent and admissible evidence that creates a factual basis for his allegations, citing *Rice*, 118 Wn.2d at 886. If Olsen's petition and evidence met the standards of *Rice* when we issued this order, they continue to do so now.

Apart from this argument, if Bryant's prior trial testimony is admitted as former testimony under ER 804(b)(1), the letter and statement would likely be admissible as impeachment evidence under ER 806. *See* ER 806; 5C WASH. PRACTICE, EVIDENCE LAW AND PRACTICE § 806.2 (6th ed.). The State agrees that if Olsen received a new trial, the letter could be used for impeachment. However, as the majority opinion rightly points out, evidence that is merely impeaching does not warrant a new trial. *State v. Macon*, 128 Wn.2d 784, 800, 911 P.2d 1004 (1996). Thus, the question reduces to whether the recantation letter is "merely impeaching" in determining whether a new trial is warranted.

80

The reasoning in *State v. Roche*, 114 Wn. App. 424, 59 P.3d 682 (2002), supports the conclusion that the recantation letter is not "merely impeaching." The two defendants in *Roche* had been convicted of methamphetamine possession. *Id. at* 428. Soon after sentencing, it became public knowledge that the chemist at the Washington State Patrol Crime Laboratory who had tested the substances recovered in the *Roche* defendants' cases had been using heroin sent to the crime lab for testing purposes. *Id.* Roche appealed the trial court's denial of his motion for a new trial based on this newly discovered evidence. Sweeney, the other defendant, filed a PRP raising the same issue after his request for court appointed counsel to help him move for a new trial was denied by the trial court. *Id.* Sweeny's PRP rested on RAP 16.4(c), the same basis as Olsen's.

In ruling on Roche's appeal and Sweeny's PRP, the *Roche* court applied the same five-factor test set out above and used by the majority in the present appeal. *Id*. at 444. In discussing the fifth factor, the court stated:

> Moreover, the evidence of [Michael] Hoover's malfeasance is more than "merely" impeaching; it is critical, with respect to Hoover's own credibility, the validity of his testing, and the chain of custody. *See State v. Savaria*, 82 Wash.App. 832, 838, 919 P.2d 1263 (1996) ("[I]mpeaching evidence can warrant a new trial if it devastates a witness's uncorroborated testimony establishing an element of the offense. In such cases the new evidence is not merely impeaching, but critical."). The record establishes that after Hoover's malfeasance became known, the State dismissed dozens of pending "Hoover cases" involving drugs other than heroin, including methamphetamine cases, because of the devastating damage to Hoover's credibility and to the chain of custody.

*Id*. at 438. The court also noted that the record reflected that if the evidence had been known at the time of trial, the chemist would never have been called as a witness. *Id*. at 439.

The new evidence in the present appeal does not call the validity of testing or the chain of custody into question as it did in *Roche*. As in *Roche*, however, the force of the recantation letter

81

is not merely to question or traverse some prior testimony. To the contrary, the recantation would not only have devastated the testimony of one of the principal witnesses against Olsen, but would have replaced that testimony with directly exculpating testimony that confirmed Olsen's. Even though other testimony against Olsen would have remained, the thrust of the recantation is not simply to impeach some testimony, but to remove central inculpating testimony and to add eyewitness testimony that is directly exculpating.

Under *Roche*, Bryant's recantation is not merely impeaching, but is critical to a fully informed resolution of the conflicting evidence. As such, it meets the fifth factor in the test for granting a PRP under RAP 16.4(c).

Turning to the issue of reliability, neither *Macon* nor *In re Pers. Restraint of Clements*, 125 Wn. App. 634, 106 P.3d 244 (2005), require that a determination whether a recantation is reliable be made before this court may order a new trial on a PRP in circumstances such as these. *Macon* did not involve a PRP, but rather an appeal of the trial court's denial of his motion to vacate and order a new trial under CrR 7.8. 128 Wn.2d at 786. In upholding the trial court's denial of the motion to vacate and for new trial, our court held that

> [w]hen a defendant is convicted upon the testimony of a witness who later recants, the trial court must first determine whether the recantation is reliable before considering a defendant's motion for new trial based upon the recantation.

*Id.* at 804. *Macon*, thus, holds that when a trial court considers a motion for new trial based on a recantation, the trial court must first determine its reliability. It does not require the same before an appellate court may grant a PRP.

*In re Clements* did involve a PRP: one challenging the trial court's denial of Clements'

motion to withdraw an *Alford*[28] plea because the principal witness had retracted some of her

allegations. 125 Wn. App. at 638. Our court upheld the trial court's denial of the motion to

withdraw because independent evidence supported the plea and the trial court was not convinced

the recantation was reliable. *Id.* at 644-45. The trial court's inquiry into the reliability of the

recantation was truncated because, as here, the recanting witness refused to testify at the hearing.

*Id*. at 644. Nevertheless, our court held that in context, "it is apparent from its ruling that the

court did not find Pendleton's recantation reliable, in large part because it was inconsistent with

the unretracted evidence in the certification." *Id*.

In reaching its conclusion, *Clements* cited *State v. D.T.M.*, 78 Wn. App. 216, 221, 896

P.2d 108 (1995), an appeal of the trial court's denial of a motion to withdraw an *Alford* plea

based on a recantation. Even though the trial court did not hold a hearing to evaluate the

recanting witness's credibility,[29] our court reversed the trial court's denial of D.T.M.'s motion

and remanded for further proceedings. *Id.* We stated:

> [W]e believe the court should have held a hearing to evaluate M.J.'s credibility. If
> she were to adhere to the facts in her recantation while under oath in open court and
> subject to cross examination, [*State v.* ]*Rolax*, [84 Wn.2d 836, 529, P.2d 1078
> (1974)], [*State v.* ]*Powell*, [51 Wash. 372, 98 P. 741 (1909)], and [*State v.* ]*York*[,
> 41 Wn. App. 538, 704 P.2d 1252 (1985)] would require the court to permit D.T.M.
> to withdraw his guilty plea and proceed to trial.

*Id.* In other words, *D.T.M.* was reversed in the absence of a reliability/credibility determination

and required the trial court to make it on remand.

---

[28] *No. Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).
[29] As the majority opinion points out, credibility is a component of the examination into
reliability.

In this matter, our order stated that "a reference hearing must be held with entry by the superior court of findings of fact on the issue of whether Bryant's recantation is credible and reliable." Spindle, Order Transferring Pet'n to Superior Court for a Reference Hr'g, at 7. More specifically, we directed:

> The superior court shall conduct a hearing to allow Olsen to present the testimony of recanting witness Bryant, subject to cross-examination. The superior court shall enter findings of fact regarding whether Bryant testifies consistently with his statement submitted in support of Olsen's PRP and whether Bryant's recantation is credible and reliable. In doing so, the superior court shall focus upon the circumstances affecting reliability and credibility set forth in *Clements*, 125 Wn. App. at 644 n.3, and *In re Personal Restraint of Spencer*, 152 Wn. App. 698, 715, 218 P.3d 924 (2009).

Spindle, Order at 7-8. Due to Bryant's invocation of the Fifth Amendment, the hearing did not occur as ordered: Byrant's testimony of significance was not presented, Bryant was not subject to cross-examination on it, and the trial court did not enter findings regarding whether Bryant testified consistently with his statement submitted in support of Olsen's PRP. Thus, a hearing was not held as ordered on Byrant's reliability and credibility. Consequently, the trial court's finding that Bryant's recantation was not reliable or credible was not made in compliance with our order.

With that, we are left in the same position as when we issued the order: a proper determination of reliability and credibility has not yet been made. There is little point in remanding for the trial court to attempt to make this determination again, on the off-chance that Bryant would not take shelter under the Fifth Amendment. On the other hand, simply denying this PRP would consign Olsen to an approximate 50-year sentence without consideration of a principal witness's recantation of central inculpatory testimony. A new trial provides the best chance of getting all evidence, possibly including Bryant's recantation, before a jury. It would

84

come, though, at a sizeable cost of judicial resources and system delay, as well as risk fading witness memories and uncertain witness availability.

The circumstances of Bryant's recantation tip this difficult balance in the direction of a new trial. Olsen was sentenced on October 23, 2015. According to exhibits 2 and 3, Bryant received a mitigated exceptional sentence for first degree robbery just four days later, on October 27, 2015. In spite of an offender score of 9 plus, Bryant received an exceptional sentence which was 21 months less than the low end of the sentencing range. Bryant's plea agreement on the robbery charge was finalized only after he testified against Olsen. In his recantation letter, Bryant stated that he lied to police and lied at Olsen's trial because he feared that unless he testified favorably for the State, he would not receive "a favorable plea bargain on . . . unrelated robbery charges." PRP at 12. Bryant's recantation letter was written within a month of Olsen's sentencing. *See* PRP at 11-12. Bryant has now refused to testify to his recantation letter because he fears the State will prosecute him for perjury if he does.

These circumstances support the reliability of Bryant's recantation. Other circumstances will raise doubts about its reliability. The cases discussed above and the requirement of RAP 1.2(a) to promote justice and facilitate decisions on the merits are not honored by denying Olsen all relief without determining the reliability of his recantation. We should order a new trial.

Finally, Olsen argues that law enforcement's use of the Stingray device to locate Stevenson violated Olsen's rights under the Fourth Amendment. The majority holds that Olsen lacked standing to challenge the use of the Stingray to track Stevenson, noting that Fourth Amendment rights are personal rights that may not be vicariously asserted; thus, one cannot invoke the Fourth Amendment rights of others. *State v. Jones*, 68 Wn. App. 843, 847, 845 P.2d

85

1358 (1993); *State v. Simpson*, 95 Wn.2d 170, 174-75, 622 P.2d 1199 (1980). This analysis, I believe, contradicts binding United States Supreme Court precedent.

In *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), the petitioners were in a car that police had stopped because they suspected it was the getaway car in an armed robbery. *Id.* at 130. The petitioners neither owned nor leased the car. *Id*. at 140. The police searched the car, finding arms and ammunition. *Id*. at 130. At issue, the Court stated, was

> whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

*Id*. at 140. Under this rule, the Court held the petitioners had no Fourth Amendment interest in the car they neither owned nor leased. *Id*. at 148.

The majority's application of these rules to Olsen founders on *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). That appeal arose from a raid by law enforcement officers of the living quarters of James Toy, whom they suspected of selling heroin. The search disclosed no illegal drugs. Toy denied selling narcotics, but told officers a Johnny Yee was. The officers then went to Yee's house and entered his living quarters, where Yee surrendered his heroin to them. Yee also told the officers that he had obtained the heroin from Toy and another individual subsequently identified as Wong Sun. The officers then arrested Wong Sun, who admitted the accuracy of a statement they had drawn up in which he admitted the use and delivery of heroin. *Wong Sun*, 371 U.S. at 473-77, 492-93. The main issue in Wong Sun's appeal was whether the trial court properly allowed that statement into evidence in his prosecution. *Id*. at 477.

86

The Supreme Court held that the officers' uninvited entry into Toy's living quarters and his arrest which followed were unlawful. *Id*. at 484. To determine the consequences of those unlawful acts, the Court asked whether

> "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Id*. at 488 (quoting JOHN MCGUIRE, EVIDENCE OF GUILT, at 221 (1959)). The Court then held that the heroin found on Yee could not be used against Toy for that reason. *Id*. As to Wong Sun, it held that the only competent source of corroboration for his statement used by the prosecution was the heroin itself. *Id*. at 492. Because of that, the Court held:

> We intimate no view one way or the other as to whether the trial judge might have found in the narcotics alone sufficient evidence to corroborate Wong Sun's admissions that he delivered heroin to Yee and smoked heroin at Yee's house around the date in question. But because he might, as the factfinder, have found insufficient corroboration from the narcotics alone, we cannot be sure that the scales were not tipped in favor of conviction by reliance upon the inadmissible Toy statement.

*Id*. at 492-93. For that reason, the Court reversed and ordered a new trial for Wong Sun. *Id*. at 493.

Because of the consequences of the officers' illegal entry into Toy's residence and his arrest, Wong Sun's own Fourth Amendment rights were violated, even though he had no privacy interest in Toy's residence. Wong Sun was asserting his own Fourth Amendment rights, not Toy's.

In the present appeal, Olsen argues that use of the Stingray device to apprehend Stevenson was illegal, and, thus, evidence developed through Stevenson's apprehension should have been suppressed. Under *Rakas*, 439 U.S. at 140, whether a challenged search violated the

rights of one seeking to exclude evidence of it depends on whether "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Assuming use of the Stingray to track Stevenson was illegal, *see United States v. Carpenter*, -- U.S. ---, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), that use would have infringed Olsen's Fourth Amendment interest under *Wong Sun* because evidence used against him was developed through the exploitation of that illegality. *See Wong Sun*, 371 U.S. at 488.

Thus, under *Wong Sun* and *Racus*, Olsen is not asserting Fourth Amendment rights vicariously or attempting to invoke the rights of others, as the majority contends. Rather, he is invoking his own direct Fourth Amendment rights, and, as such, his standing to vindicate those rights is not foreclosed by *Jones* or other decisions cited by the majority.

Even though Olsen had standing to challenge use of the Stingray, evidence need not be suppressed under the fruit of the poisonous tree doctrine if obtained from an independent source. *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). I agree that there was sufficient evidence apart from information derived through the Stingray to justify arresting Stevenson. Thus, no evidence developed as a result of Stevenson's arrest need be excluded, even if use of the Stingray was unconstitutional under *Carpenter*.

Bjorgen, J.P.T.